## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| MAXWELL, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-173 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 20, 29, 35 |
| | : | | |
| THE ISLAMIC REPUBLIC OF IRAN, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT ON
LIABILITY AND AN AWARD OF PUNITIVE DAMAGES;
GRANTING MOTION TO SUBSTITUTE;
ADOPTING IN PART SPECIAL MASTER'S REPORT AND RECOMMENDATION

## I. INTRODUCTION

In 1983 and 1984, two terrorist attacks targeted American servicemembers and embassy

employees stationed in Beirut, Lebanon.  This Court, along with other courts in this Circuit, has

contended with the tragic impact of these bombings in a number of mass tort lawsuits brought

under the Foreign Sovereign Immunities Act ("FSIA").  *See, e.g.*, *Barry v. Islamic Republic of*

*Iran* ("*Barry I*"), 410 F. Supp. 3d 161 (D.D.C. 2019); *Barry v. Islamic Republic of Iran* ("*Barry*

*II*"), 437 F. Supp. 3d 15 (D.D.C. 2020).[1]  Presently before the Court are the claims of over three

hundred individuals who were either injured—in some cases fatally—in these attacks while

members of the armed forces or acting in their capacity as a U.S. government employee or

contractor, or who are the immediate family members of such directly injured individuals.

---

[1] Given the similarities between *Barry II* and this case, this opinion draws heavily from
the Court's opinion in *Barry II* without sentence-by-sentence citation.  *See* Special Master's
Proposed Findings of Fact & Conclusions of Law ("R. & R."), ¶ 3, ECF No. 34 ("*Barry* [*II*] and
this case . . . involve identical underlying facts and circumstances and similar injuries . . . .").

Defendant Iran has not entered an appearance in the more than two years since the suit was filed.

This Court must now decide whether to enter default judgment concerning liability, whether to

adopt the Special Master's Report and Recommendation regarding compensatory damages, and

whether to award punitive damages to Plaintiffs.  As set forth below, the Court finds that all

Plaintiffs but two have established liability and will enter default judgment concerning these

individuals; adopts in part the Special Master's suggested damages awards; and awards punitive

damages in part.

## II.  BACKGROUND

### A.  Factual History

The directly injured Plaintiffs were injured in the 1983 terrorist attack on the U.S.

Embassy in Beirut, Lebanon, and/or the attack on the U.S. Embassy Annex in East Beirut the

following year.[2]  Compl. ¶¶ 1, 7, ECF No. 4.  The bombing of the U.S. Embassy on April 18,

---

[2] As this Court explained in *Barry I*, 410 F. Supp. 3d at 168 n.1, and *Barry II*, 437 F. Supp. 3d at 26 n.5, the Federal Rules of Evidence authorize a court to take judicial notice of "adjudicative facts" "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), including "court records in related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing 29 Am. Jur. 2d Evidence § 151 (2010)); *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938); 2 McCormick on Evidence § 332 (6th ed. 2009)).  Because of the number of individuals affected by terrorist attacks, and the associated "flood of cases that they generate," courts in this Circuit resolving FSIA cases have "regularly" taken judicial notice of the record in related cases.  *Goldstein v. Islamic Republic of Iran*, No. 16-CV-2507 (CRC), 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018) (citing *Rimkus*, 750 F. Supp. 2d at 171); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 262–63 (D.D.C. 2006).  Significantly, "courts have taken notice of facts found in earlier proceedings in this District even when those proceedings have taken place in front of a different judge."  *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer*, 664 F. Supp. 2d at 54).

Other courts in this Circuit have resolved numerous cases arising out of the 1983 and 1984 bombings in Beirut, Lebanon.  *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 46 (suit involving survivor of 1984 Annex bombing); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 130–33 (D.D.C. 2001) (suit on behalf of individual killed in 1984 Annex bombing); *Estate of*

1983, "was the first large-scale attack against a United States Embassy anywhere in the world." *Dammarell v. Islamic Republic of Iran* ("*Dammarell I*"), 281 F. Supp. 2d 105, 111 (D.D.C. 2003). At just past 1:00 p.m. on that date, a vehicle "laden with hundreds of pounds of explosives" was driven into the main entrance of the Embassy, whereupon it "exploded with a force so powerful that seven floors in the center section of the crescent-shaped building collapsed." *Id.*; *see also Salazar v. Islamic Republic of Iran*, 370 F. Supp. 105 (D.D.C. 2005) (taking judicial notice of the *Dammarell* court's factual findings regarding the 1983 attack). As a result of this attack, over sixty individuals were fatally wounded and over one hundred others were injured. *Dammarell I*, 281 F. Supp. 2d at 111.

After the 1983 attack, the operations of the U.S. embassy were transferred to the Embassy Annex, located in a different part of the city that was believed to be safer. *See Estate of Doe I*, 808 F. Supp. 2d at 7. But tragedy struck once more on September 20, 1984. That morning, the driver of a vehicle loaded with explosives evaded the concrete barriers put up as protection, ignored orders to halt, and detonated a bomb estimated to contain approximately 1500 kilograms of explosives. *See Barry I*, 410 F. Supp. 3d at 169 (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 132 (D.D.C. 2001)). The explosion, which "demolished the embassy building,"

---

*Doe v. Islamic Republic of Iran* ("*Estate of Doe I*"), 808 F. Supp. 2d 1, 7 (D.D.C. 2011) (suit by family members and individuals killed or injured in 1983 or 1984 attacks); *Dammarell v. Islamic Republic of Iran* ("*Dammarell I*"), 281 F. Supp. 2d 105, 108–113 (D.D.C. 2003) (suit involving over eighty survivors of 1983 Embassy attack). In resolving these and other prior suits, courts in this Circuit have offered detailed factual reporting of the attacks. Thus, in this section and throughout this opinion, the Court takes judicial notice of these and related cases to draw its own, independent findings of fact in the instant case. *See Rimkus*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation" may, in resolving "subsequent related cases," properly "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." (citing *Murphy*, 740 F. Supp. 2d at 58–59)).

*Wagner*, 172 F. Supp. 2d at 132, killed over ten individuals and injured over fifty others, *see Estate of Doe I*, 808 F. Supp. 2d at 8.

The directly injured Plaintiffs were among those struck by one or both attacks. Their hundreds of immediate family members have contended with the ongoing pain of the bombings for over four decades. Based on Plaintiffs' filings, it is clear that these acts of terror deeply affected these individuals' lives.

## B. Procedural History

This case was filed by several individuals who were working at the Embassy or Embassy Annex at the time of the bombings, as well as hundreds of their immediate family members. Compl. ¶ 1. Plaintiffs fall into two categories.

The first category—the "directly injured" Plaintiffs—consists of individuals who were employed by, or performing contracts awarded by, the U.S. government, or members of the armed services serving at the U.S. Embassy in Beirut, at the time of the 1983 and/or 1984 bombings of the U.S. Embassy and U.S. Embassy Annex in Beirut, Lebanon, who were injured or killed as a result of those attacks, or the estates of such individuals. Mem. P. & A. Supp. Pls.' Mot. Default J. on Liability and an Award of Punitive Damages ("Pls.' Mot.") at 1–2, ECF No. 29-1. The second category—the "family member" Plaintiffs—consists of "[i]mmediate family members of those employee/contractor or armed forces victims who suffered severe emotional distress as a result of the attacks on their loved ones." *Id.* at 2.

Plaintiffs present several theories of relief. First, Plaintiffs who are U.S. nationals and U.S. Government employees or contractors seek compensatory damages pursuant to 28 U.S.C. § 1605A(c)'s private cause of action, Compl. ¶¶ 434–40, and, in addition, the personal representatives of those who were fatally injured in one of the attacks seek damages for wrongful

death, *id.* ¶¶ 447–51.  Second, all Plaintiffs, including both the directly injured Plaintiffs and the

family member Plaintiffs, seek compensatory damages for intentional infliction of emotional

distress ("IIED"), *id.* ¶¶ 441–45, and the family member Plaintiffs seek compensatory damages

for solatium and/or loss of consortium due to the "extreme mental anguish, emotional pain and

suffering, and the loss of the society and companionship of the victims," *id.* ¶¶ 452–56.[3]  Finally,

all Plaintiffs seek punitive damages pursuant to 28 U.S.C. § 1605A.  *Id.* ¶¶ 457–60.

Given the number of individuals involved and their location across multiple continents,

counsel for Plaintiffs moved for adoption of an administrative plan wherein an appointed special

master would "submit a Report & Recommendation to the Court containing findings of fact and

conclusions of law regarding compensatory damages as to each of the Plaintiffs' claims."  Mem.

Supp. Mot. Adoption Admin. Plan. at 8, ECF No. 15-1.  The Court granted this motion, *see*

Order on Mot. Adoption Admin. Plan, ECF No. 18, and Special Master Paul Griffin's sealed

report was filed on November 16, 2023, *see* Special Master's Proposed Findings of Fact &

Conclusions of Law ("R. & R."), ECF No. 34.  Plaintiffs have also filed a motion requesting the

substitution of certain legal representatives, ECF No. 20, a motion seeking default judgment on

liability and an award of punitive damages, ECF No. 29, and a motion to adopt the Special

Master's Report and Recommendation, ECF No. 35.  Defendant Iran continues to decline to

participate in this suit, and Plaintiffs' pending motions have ripened.

\*          \*          \*

The questions facing the Court are whether it should, as a matter of law, enter default

judgment on Plaintiffs' claims regarding liability, whether it should adopt the Special Master's

---

[3] Technically, these plaintiffs seek damages for "loss of solatium," Compl. at 164, but the
Court follows the language of section 1605A and uses the term "solatium."  *See* 28 U.S.C.
1605A(c).

Report and Recommendation on compensatory damages, and whether it should award Plaintiffs punitive damages.  For the reasons set forth below, the Court grants in part default judgment concerning liability, adopts in part the damages recommendations in the Special Master's report, and awards in part Plaintiffs' request for punitive damages.

### III.  LEGAL STANDARD

#### A.  Default Judgment

As this Court previously detailed in *Barry I*, 410 F. Supp. 3d at 170–71, and *Barry II*, 437 F. Supp. 3d at 28, Federal Rule of Civil Procedure 55 sets forth a two-step process for a party seeking default judgment: entry of default, followed by entry of default judgment.  Fed. R. Civ. P. 55; *see also Int'l Painters & Allied Trades Indust. Pension Fund v. Rose City Glass Co.*, 729 F. Supp. 2d 336, 338 n.3 (D.D.C. 2010) (citing Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)).  First, after a defendant has failed to plead or otherwise defend against an action, the plaintiff may request that the clerk of the court enter default against that defendant.  *See* Fed. R. Civ. P. 55(a).  Second, following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, Rule 55(b)(2) permits the plaintiff to apply to the court for entry of default judgment.  Fed. R. Civ. P. 55(b)(2).  By providing for a two-step process, Rule 55 provides the defendant an opportunity to move the court to set aside the default before the court enters default judgment. Fed. R. Civ. P. 55(b)–(c).

Although entry of default judgment may at times be appropriate, it is "not automatic." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted)).  Because "strong policies favor the resolution of disputes on their merits," the court "normally" must view the default judgment as

"available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)).  Even if a defendant appears "essentially unresponsive," *id.*, the court still has an "affirmative obligation" to ensure that it has subject matter jurisdiction over the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  The court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.  "[A]lthough the plaintiffs retain 'the burden of proving personal jurisdiction,'" "[i]n the absence of an evidentiary hearing," plaintiffs can "satisfy that burden with a *prima facie* showing." *Braun*, 228 F. Supp. 3d at 74 (internal quotation marks omitted) (quoting *Mwani*, 417 F.3d at 7).  To make the required prima facie showing, plaintiffs may rely on "their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani*, 417 F.3d at 7.

## B.  Evidentiary Showing Required by the FSIA

A court addressing an FSIA claim can enter default judgment against a foreign state only if "the claimant[s] establish[] [their] right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").  This statutory standard mirrors the default judgment standard of Federal Rule of Civil Procedure 55(d).  *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 90 (D.D.C. 2019) (citing *Owens v. Republic of Sudan* ("*Owens II*"), 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003)).  The "FSIA leaves it to the court to determine

precisely how much and what kinds of evidence . . . plaintiff[s] must provide, requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).  A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in section 1605A of the FSIA: to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future." *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)).  In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus*, 750 F. Supp. 2d at 171).  "Uncontroverted factual allegations that are supported by admissible evidence are taken as true." *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 94–95 (D.D.C. 2006)).

## IV.  ANALYSIS

As the Court explained in *Barry I*, 410 F. Supp. 3d at 170–71, and *Barry II*, 437 F. Supp. 3d at 28, before entering default judgment in a suit under the FSIA, it is to complete a multi-step process.  First, as a threshold matter, it must ensure that it has subject matter jurisdiction over Plaintiffs' claims and, in addition, the Court must confirm that it may properly exercise personal jurisdiction over the Defendant.  *Barry I*, 410 F. Supp. 3d at 172.  Then, upon a finding that jurisdiction is proper, the Court must decide liability and damages.  *Id.*  For the reasons set forth below, the Court finds that it has original jurisdiction over this suit pursuant to the FSIA, that it

has personal jurisdiction over Defendant Iran, and that all Plaintiffs but two have established liability and a right to relief in the form of compensatory damages.  The Court also awards punitive damages to the Plaintiffs that are granted default judgment on liability under both federal and state-law claims.[4]

### A.  Jurisdiction[5]

Subject to an adequate showing by Plaintiffs, the FSIA waives Defendant's sovereign immunity and grants this Court subject matter jurisdiction over this suit.  The FSIA separately sets forth procedural requirements to establish personal jurisdiction.  For the reasons discussed below, the Court concludes that it has jurisdiction here.

### 1.  Waiver of Sovereign Immunity

The pertinent jurisdictional question is whether the FSIA's "terrorism exception," 28 U.S.C. § 1605A, applies such that Defendant Iran—a foreign state—is "not entitled to immunity," 28 U.S.C. § 1330(a), and Plaintiffs may pursue their claims before this Court.  *See Barry I*, 410 F. Supp. 3d at 172–73 (summarizing background sovereign immunity principles).  The terrorism exception establishes "that a foreign state is not immune in 'any case' in which

---

[4] The Court will not consider whether Plaintiffs satisfied the limitation period in § 1605A(b).  Under the law of this Circuit, "the limitation period in § 1605A(b) is not jurisdictional" and therefore a sovereign will "forfeit[] its limitation defense by defaulting in the district court."  *Owens II*, 864 F.3d at 801; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108–09 (D.C. Cir. 2019).  Here, Iran is in default, having never appeared in this case.  *See* Clerk's Entry of Default, ECF No. 17.

[5] As explained in *Barry I* and *Barry II*, 28 U.S.C. § 1330 confers federal district courts with "original jurisdiction" in FSIA cases.  *See* 28 U.S.C. § 1330(a) (stating that original jurisdiction exists "without regard to amount in controversy" in "any nonjury civil action against a foreign state" that seeks "relief *in personam*," and for which "the foreign state is not entitled to immunity").  Here, Plaintiffs have not demanded a jury trial and seek only monetary damages, *see generally* Compl., and Defendant Iran is plainly a foreign state.  Thus, the Court will focus on the final element: whether Defendant Iran is "not entitled to immunity," such that the Court may exercise subject matter jurisdiction over Plaintiffs' claims.

'money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Id.* at 173 (quoting 28 U.S.C. § 1605A). A plaintiff in a suit brought under the FSIA "'bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies,' whereupon, if the defendant fails to appear, 'jurisdiction attaches.'" *Id.* (quoting *Owens II*, 864 F.3d at 784). In addition, the terrorism exception applies only if two prerequisites are met: (1) the foreign state was designated as a "state sponsor of terrorism at the time of the act," and "remains so designated when the claim is filed," 28 U.S.C. § 1605A(a)(2)(A)(i)(I), and (2) the "claimant or the victim was" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States[] or . . . an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at the time of the act, *id.* § 1605A(a)(2)(A)(ii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019). The Court will first consider whether these threshold requirements are met and then consider whether this suit falls within the terrorism exception's waiver of sovereign immunity, thereby conferring subject matter jurisdiction.

> *a. Requirements for a Claim to Be Heard Under Section 1605A*

The Court finds that § 1605A's prerequisites are met. First, Iran was designated as a state sponsor of terrorism in 1984, *see* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984), and has remained so designated ever since, *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited February 20, 2024). Thus, the

claims involving injuries suffered as a result of the 1984 bombing satisfy the first portion of

section 1605A.  So, too, do the claims relating to the 1983 bombing.  Although Iran was not

designated as a state sponsor of terrorism at the time of the earlier bombing, Iran was "so

designated" as a state sponsor of terrorism "as a result of" the 1983 bombing.  28 U.S.C. §

1605A(a)(2)(A)(i)(I); *see Dammarell v. Islamic Republic of Iran* ("*Dammarell IV*"), 404 F.

Supp. 2d 261, 273 (D.D.C. 2005) ("On January 19, 1984, President Reagan designated Iran a

state sponsor of terrorism.  This designation was in response to Iran's role in sponsoring a

number of terrorist acts in Lebanon, including the April 18, 1983, Embassy bombing at issue

here." (citations omitted)); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 120 (D.D.C.

2012) ("Iran was designated by the U.S. Secretary of State as a sponsor of terrorism, partially in

response to the [1983] Beirut bombing." (citation omitted)).  Consequently, the first prerequisite

for a claim to be heard under section 1605A is met for Plaintiffs' claims involving injuries

arising from both the 1983 and 1984 bombings.

      In addition, Plaintiffs have fulfilled the second prong of section 1605A(a).  Again, the

terrorism exception applies only if the "claimant or victim was," at the time of the act, a national

of the United States, a member of the armed forces, or working as "an employee of the

Government of the United States" or "performing a contract awarded by the United States

Government" and, in either case, "acting within the scope of the employee's employment."  28

U.S.C. § 1605A(a)(2)(A)(ii).  Special Master Griffin's findings of fact establish by a clear and

convincing evidence standard, R. & R. ¶ 16, that the Plaintiffs directly injured in the attacks were

either members of the armed forces or U.S. government employees or performing contracts

awarded by the U.S. government at the time of the act, and that all were acting within the scope

of their employment.  The Court accepts the Special Master's findings of fact, derived from

uncontroverted evidence presented to him, on this matter.  These claimants plainly fall within the

section 1605A categories of individuals entitled to bring a claim.  Each of the remaining claims

that are brought by immediate family members, moreover, is rooted in one of these claims.  In

other words, as has been the case in other suits involving claims for relief by family members of

directly injured individuals, the remaining "claims are derived from claims where the victims

were U.S. Government employees," members of the armed services, or performing contracts

awarded by the U.S. government "at the time of the attack as required by

§ 1605A(a)(2)(A)(ii)(I)-(III)."  *Estate of Doe I*, 808 F. Supp. 2d at 13.  Thus, all Plaintiffs have

met the threshold requirements for a claim to be heard under section 1605A.

### b. Section 1605A's Waiver of Sovereign Immunity

With these threshold requirements met, the next jurisdictional issue facing the Court is

whether Plaintiffs have met each of the requirements enumerated in section 1605A itself.  As the

Court discussed in *Barry I*, "an exception to sovereign immunity exists for a foreign defendant

when the FSIA claimant seeks [1] 'money damages' [2] 'against a foreign state' for [3] 'personal

injury or death that [4] was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage,

hostage taking, or the provision of material support or resources for such an act.'"  410 F. Supp.

3d at 174 (quoting 28 U.S.C. § 1605A(a)(1); *see also Oveissi v. Islamic Republic of Iran*

("*Oveissi III*"), 879 F. Supp. 2d 44, 51–52 (D.D.C. 2012); *Wultz v. Islamic Republic of Iran*, 864

F. Supp. 2d 24, 33 (D.D.C. 2012).  Just as in *Barry I*, the Court finds that each of the elements is

met.  First, because Plaintiffs seek money damages in the form of compensatory, economic, and

punitive damages against Defendant Iran, *see, e.g.*, Compl. at 165–66, prongs one and two are

satisfied.  Second, the Special Master's report and recommendation sets forth in substantial detail

how each of the directly injured Plaintiffs suffered physical injuries and—in the case of ten

Plaintiffs—how they were fatally injured in the attack.  *See generally* R. & R.  It also delineates

how each of their immediate family members suffered emotional pain and suffering due to the

injuries of their loved ones.  *See id.*  The Court adopts the Special Master's uncontroverted

findings of fact concerning the personal injury or death of each of the Plaintiffs and therefore

finds that the third prong is met.

Furthermore, Plaintiffs carry their burden regarding prong four: causation.  "Causation in

a FSIA suit is established when the plaintiff shows proximate cause, or 'some reasonable

connection' between the defendant's act and 'the damages which the plaintiff has suffered.'"

*Barry I*, 410 F. Supp. 3d at 174–75 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d

52, 66 (D.D.C. 2010)); *see also Owens II*, 864 F.3d at 794 (affirming proximate cause as the

jurisdictional standard pursuant to 28 U.S.C. § 1605A).  In this case, for the 1983 Embassy

bombing, Plaintiffs allege that "the personal injuries and/or deaths of the Plaintiff . . . victims of

the April 18, 1983 attack, and the injuries to the Plaintiff family members . . . were the direct and

proximate result of the willful, wrongful, intentional, and reckless acts of" individuals "whose

acts were materially supported, funded and directed by Iran and its agents while acting within the

scope of their offices, employment, or agencies."  Compl. ¶ 422.  Plaintiffs further allege that, for

the 1984 Embassy Annex bombing, the same is true.  *Id.* ¶ 432.  The Court, taking judicial notice

of evidentiary findings in other cases in this jurisdiction to draw its own conclusions of fact, *see*

*Rimkus*, 750 F. Supp. 2d at 172, agrees.

As Plaintiffs document in detail, numerous other courts in this district have linked Iran to

both the 1983 and 1984 attacks.  Because the Court already established that there is a

"reasonable connection" between Iran's support for the 1984 Annex attack and injuries suffered

by those present at the site of the bombing, *see Barry I*, 410 F. Supp. 3d at 174–75, it will not

13

retread this ground.  Here, as in its prior analysis, the Court takes judicial notice of the ample

evidence set forth in prior cases and concludes that this evidence is sufficient to "justify a

specific finding that defendant[] [Iran] provided support for the 1984 attack on the U.S. Embassy

Annex in Lebanon."  *Estate of Doe I*, 808 F. Supp. 2d at 16 (citing *Wagner*, 172 F. Supp. 2d at

133; *Welch v. Islamic Republic of Iran*, No. 01-863, 2007 WL 7688043 (CKK) (AK), at *27

(D.D.C. Sept. 20, 2007); *Brewer*, 664 F. Supp. 2d at 54).

 Other courts in this district, moreover, have heard relevant testimony and reached the

same conclusion concerning the 1983 attack on the U.S. Embassy in Lebanon.  *See Estate of Doe

I*, 808 F. Supp. 2d at 15 ("[T]he evidence presented at the *Dammarell* evidentiary trial 'show[ed]

unquestionably that Iran and MOIS provided material support to Hezbollah, and that this support

was the *proximate cause* of the 1983 Beirut embassy bombing and the deaths and injuries that

resulted.'" (quoting *Dammarell v. Islamic Republic of Iran* ("*Dammarell II*"), No. 01-2224

(JDB), 2005 WL 756090, at *6 (D.D.C. Mar. 29, 2005))); *Dammarell IV,* 404 F. Supp. at 272

(citing expert testimony to support the conclusion that "the complexity of the attack upon the

U.S. Embassy in Beirut evidenced Iran's central role in the attack"); *Salazar*, 370 F. Supp. 2d at

109 ("[P]laintiff's submissions and the trial record amply support the allegations . . . [that] Iran,

the MOIS, and the IRGC directly and proximately caused the death of Mr. Salazar" in the 1983

embassy bombing.).  Based on these prior evidentiary findings and the filings before it, the Court

finds that Plaintiffs have established a "reasonable connection" between Iran's support for both

the 1983 and 1984 attacks and their alleged injuries.  Thus, Plaintiffs have satisfied the fourth

prong of section 1605A.

 In addition, for reasons this Court documented in detail in *Barry I*, this showing suffices

to meet section 1605A's fifth prong: the requirement that claims brought pursuant to the FSIA

14

must arise out of, as relevant here, "extrajudicial killing . . . or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Here, the Court concludes that driving a vehicle laden with explosives into a building filled with U.S. government workers and contractors (as in the 1983 attack) or detonating such a vehicle in close proximity to a building full of embassy employees (as in the 1984 attack) is plainly an "extrajudicial killing" as set forth in the FSIA.  *See* 28 U.S.C. § 1605A(h)(7) (defining term by reference to section 3 of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(g), 106 Stat. 73 (1992)).  Moreover, drawing from the voluminous evidentiary records compiled by other courts in related cases in this Circuit, as described above, the Court further concludes that Iran provided "material support or resources" as defined by the FSIA.  *See id.* § 1605A(h)(3) (providing, in relevant part, that "'material support or resources' means any property, tangible or intangible, or service" (referencing 18 U.S.C. § 2339A)).

Accordingly, all of section 1605A's subject matter jurisdictional requirements are met, and Iran's sovereign immunity is waived with respect to Plaintiffs' claims.

### 2.  Personal Jurisdiction

An additional jurisdictional question facing this Court is whether Plaintiffs have met the FSIA's separate procedural requirements regarding personal jurisdiction.  "Personal jurisdiction exists over a non-immune sovereign so long as service of process has been made as required by section 1608" of the statute.  *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 255 (D.D.C. 2006) (citation omitted); 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title.").  Section 1608 provides four ways to effect service: [1] "special arrangement for service between

the plaintiff and the foreign state or political subdivision;" [2] "in accordance with an applicable international convention on service of judicial documents;" [3] in cases where the first two methods do not suffice to effect service, "by sending a copy of the summons and complaint and a notice of suit" including translations "into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or [4] if the third method also fails,

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

Here, neither option one nor option two applies.  Plaintiffs do not have a "special arrangement" with Iran, nor is there an "applicable international convention."  *Id.*  Plaintiffs therefore attempted to effectuate service using the third method.  *See* Aff., Feb. 11, 2022, ECF No. 8 (request by Plaintiffs' counsel that Clerk of Court mail a copy of the summons, complaint, and notice of suit by registered mail to the Ministry of Foreign Affairs for the Islamic Republic of Iran).  When service was not successful with this method, *see* Notice Regarding Inability to Effect Service Under 28 U.S.C. § 1608(a)(3), ECF No. 11, Plaintiffs resorted to the fourth method and requested that the "Clerk dispatch the alternative means of service prescribed by 28 U.S.C. 1608(a)(4)," including "send[ing] two copies of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, 'by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court

to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services.'"  Request for Service of Summons, Notice of Suit, and Complaint on Def. (Mar. 28, 2022), ECF No. 12.  The Clerk of the Court thereafter indicated that the papers were transmitted to the State Department pursuant to 28 U.S.C. § 1608(a)(4), Certificate of Clerk, Mar. 28, 2022, ECF No. 13, and later provided notice that the documents were transmitted through diplomatic channels as the statute requires, *see* Return of Service Affidavit, ECF No. 14 (stating that the "documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1119-IE, dated October 24, 2022 and delivered on October 25, 2022").  Thus, Plaintiffs have satisfied section 1608's service of process requirements, and the Court may exercise personal jurisdiction over Defendant.

### B.  Plaintiffs' Eligibility to Bring Section 1605A Claims

One last threshold matter remains before assessing liability: whether Plaintiffs are eligible to bring a claim pursuant to section 1605A.[6]  Here, as indicated previously, Plaintiffs consist of two categories of individuals: (1) individuals who were members of the armed forces, or employed by or performing contracts awarded by the U.S. government at the time of one or both attacks, or the estates of such individuals, and (2) the immediate family members of such directly injured individuals, or the legal representatives of these immediate family members.  Pls.' Mot. at 1–2.  The Court will next consider whether the estates of the now-deceased Plaintiffs within each of the two above categories have standing, after briefly considering a

---

[6] As the Court explained in *Barry I*, this inquiry is essential because "the question [of] whether a statute withdraws sovereign immunity"—as the Court has concluded, for the reasons detailed above, that the FSIA has done in this instance—"is 'analytically distinct' from whether a plaintiff has a cause of action."  410 F. Supp. 3d at 176 (quoting *Owens II*, 864 F.3d at 807); *see also FDIC v. Meyer*, 510 U.S. 471, 484 (1994); *United States v. Mitchell*, 463 U.S. 206, 218 (1983)).  The Court discusses the relevant theories of liability that might give rise to a cause of action for each of the categories of Plaintiffs below.

threshold issue regarding whether certain now-deceased Plaintiffs may substitute a legal

representative.

### 1.  Substitution of Legal Representatives

Before addressing the standing of the various estates, the Court addresses a preliminary

issue regarding the legal representatives pursuing some of these claims.  Plaintiffs filed a motion

to substitute for five Plaintiffs for the estates of now-deceased Plaintiffs under Federal Rule of

Civil Procedure 25(a).[7]  Pls.' Mot. Substitute & Mem. Supp. ("Subs. Mot."), ECF No. 20.  "A

deceased individual" such as these Plaintiffs "cannot serve as the real party in interest in a civil

action."  *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 54 n.2 (D.D.C. 2013)

(citing Fed. R. Civ. P. 25(a)(1)).  If, as here,

> a party dies during litigation, Rule 25 allows for the substitution of a proper party.
> It states that once a formal suggestion of death is made on the record, a party or the
> decedent's successor or representative has 90 days in which to file a motion for
> substitution of a proper party.

*Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014).  Plaintiffs filed both

their suggestions of death and motion to substitute on the same day.  Even if they had not, "the

Court may, *sua sponte*, substitute an appropriate person, such as a close relative, as a

representative of the decedent's estate."  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 22

n.17 (D.D.C. 2016) (quoting *Mohammadi*, 947 F. Supp. 2d at 55).  Moreover, as the *Mohammadi*

---

[7] These individuals are Jane Wife VBrown, Compl. ¶ 163, for whom Plaintiffs seek to
substitute her son, John Son1 VBrown, Pls.' Mot. Substitute & Mem. Supp. ("Subs. Mot.") at 1,
ECF No. 20; Jane Wife GGBrown, Compl., ¶ 220, for whom Plaintiffs seek to substitute her
daughter, Jane Daughter1 GGBrown, Subs. Mot. at 1; Jane Mother NNNBrown, Compl. ¶ 403,
for whom Plaintiffs seek to substitute her son, John Victim NNNBrown, Subs. Mot. at 1; Jane
Victim QBrown, for whom Plaintiffs seek to substitute her son, John Brother QBrown, as the
new legal representative following the death of her now-deceased legal representative, Jane
Victim QBrown, Subs. Mot. at 1; and John Brother2 XBrown, Compl. ¶ 168, for whom Plaintiffs
seek to substitute his son, John Representative XBrown, Subs. Mot. at 1.

court explained, Federal Rule of Civil Procedure "25(a)(1) itself provides that '[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.'"  947 F. Supp. 2d at 54 n.2.  With these principles in mind, the Court grants Plaintiffs' motion to substitute legal representatives for the now-deceased Plaintiffs.

### 2.  Standing of Estates

The Court will next consider whether the estates of the now-deceased Plaintiffs have standing.  "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'"  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) (second alteration in original) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12–13 (D.D.C. 2011)).  The standing of the estate is a "threshold question" that is "governed by the law of the state which also governs the creation of the estate."  *Worley*, 75 F. Supp. 3d at 333 (quoting *Taylor*, 811 F. Supp. 2d at 12); *see also Lelchook v. Syrian Arab Republic* ("*Lelchook II*"), No. CV 16-1550 (RC), 2019 WL 2191177, at *1 (D.D.C. Mar. 25, 2019) (quoting *Taylor*, 811 F. Supp. 2d at 12).

Plaintiffs have provided uncontroverted evidence regarding which state's law governs the creation of each of the estates bringing claims in this suit.  *See* Pls.' Mot. at 11–18.  Specifically,

seven estates were created under Virginia law;[8] two estates were created under Texas law;[9] one estate was created under Pennsylvania law;[10] one estate was created under New Jersey law;[11] one estate was created under Michigan law;[12] two estates were created under South Carolina law;[13] one estate was created under Minnesota law;[14] one estate was created under Syrian law;[15] two estates were created under United Kingdom law;[16] and the rest of the estates were created under Lebanese law.[17]

---

[8] These are the estates of John Victim VBrown, Compl. ¶ 162, whose claims are brought by his son, referred to as John Son1 VBrown, *id.*; R. & R. ¶ 1242; Ben Henry Maxwell, Compl. ¶ 8, whose claims are brought by Eunice Maxine Woody, R. & R. ¶ 18; Virginia Glover Maxwell, Compl. ¶ 10, whose claims are brought by Lelia Maxwell Johnson, R. & R. ¶ 34; Jane Wife MBrown, Compl. ¶ 128, whose claims are brought by Jane Daughter1 MBrown, *id.*; R. & R. ¶ 963; Jane Wife VBrown, Compl. ¶ 163, whose claims are brought by John Son1 VBrown, R. & R. ¶ 1256; and John Joseph Hussey, Jr., and Jeannette Marie Hussey, Compl. ¶¶ 114–15, whose claims are brought by Peter James Hussey, R. & R. ¶¶ 851, 857.

[9] These are the estates of Richard Twine, Compl. ¶ 15, whose claims are brought by James Charles Twine, R. & R. ¶ 78; and Raymond Joseph Piascik, Compl. ¶ 118, whose claims are brought by Patricia Anne Piascik, R. & R. ¶ 879.

[10] This is the estate of Albert Nicholas Alexander, Compl. ¶ 107, whose claims are brought by Susan Helene Alexander, R. & R. ¶ 791.

[11] This is the estate of John Victim NNBrown, Compl. ¶ 258, whose claims are brought by John Son NN Brown, *id.*; R. & R. ¶ 2072.

[12] This is the estate of John Victim KKKBrown, Compl. ¶ 378, whose claims are brought by Jane Daughter1 KKKBrown, *id.*; R. & R. ¶ 3112.

[13] These are the estates of Tommie Franklin Brant and Ann Wooten Brant, Compl. ¶¶ 95–96, whose claims are brought by Russell Franklin Brant, R. & R. ¶¶ 668, 674.

[14] This is the estate of Evelyn Betty Middleton, Compl. ¶ 91, whose claims are brought by Bette Anne Wheeler, R. & R. ¶ 639.

[15] This is the estate of John Victim Brown, Compl. ¶ 26, whose claims are brought by John Son1 Brown, *id.*; R. & R. ¶ 175.

[16] These are the estates of Charles James Twine and Violet Elsie Twine, Compl. ¶¶ 20–21, whose claims are brought by Andrea Lynn Meyers, R. & R. ¶¶ 127, 133.

[17] These are the estates of Jane Wife Brown, John Victim ABrown, Jane Sister2 ABrown, John Victim BBrown, Jane Mother BBrown, John Brother1 BBrown, John Brother2 BBrown, John Victim CBrown, Jane Mother CBrown, Jane Sister1 CBrown, Jane Sister2 CBrown, John Victim DBrown, John Victim EBrown, Jane Mother EBrown, John Victim FBrown, John Victim GBrown, John Father GBrown, Jane Mother GBrown, John Brother1 GBrown, Jane Mother

The Court next considers the applicable laws of each of these domestic and foreign states.[18]  For the reasons set forth below, it has been established that the individuals who serve as legal representatives for the estates of the deceased Plaintiffs, other than the estates governed by United Kingdom law, have standing under the governing statutes and/or law of inheritance for each of the respective jurisdictions.  The question of United Kingdom law regarding a family member's ability to state a claim to recover emotional damages stemming from the loss of a child has not been sufficiently addressed at this time.

---

HBrown, Jane Mother IBrown, John Father JBrown, Jane Mother KBrown, John Brother KBrown, Jane Mother LBrown, Jane Sister3 LBrown, Jane Sister NBrown, John Father OBrown, Jane Mother OBrown, John Victim PBrown, Jane Wife PBrown, Jane Daughter2 PBrown, Jane Mother QBrown, John Father SBrown Father TBrown, Jane Mother SBrown Mother TBrown, Jane Mother UBrown, John Brother UBrown, John Brother WBrown, John Brother2 XBrown, John Father YBrown, Jane Mother YBrown, Jane Sister6 YBrown, John Father ZBrown, Jane Mother ZBrown, Jane Mother BBBrown, Jane Sister2 BBBrown, John Father CCBrown, Jane Mother CCBrown, Jane Wife DDBrown, Jane Mother DDBrown, John Victim GGBrown, Jane Wife GGBrown, John Brother2 HHBrown, John Brother3 HHBrown, John Brother4 HHBrown, Jane Sister1 HHBrown, Jane Sister2 HHBrown, Jane Mother JJBrown, John Father KKBrown, Jane Mother KKBrown, John Father MMBrown, Jane Mother NNBrown, Jane Daughter1 PPBrown, John Husband PPBrown, John Father QQBrown, John Brother1 QQBrown, Jane Mother SSBrown, John Brother1 SSBrown, John Father TTBrown, Jane Mother TTBrown, John Father UUBrown, Jane Sister UUBrown, John Victim VVBrown, John Father XXBrown, Jane Mother XXBrown, John Father YYBrown, Jane Mother YYBrown, John Father BBBBrown, John Brother CCCBrown, Jane Mother DDDBrown, John Victim EEEBrown, John Father EEEBrown, Jane Mother EEEBrown, Jane Mother FFFBrown, John Father GGGBrown, Jane Mother GGGBrown, John Father HHHBrown, Jane Mother HHHBrown, John Father IIIBrown, Jane Mother IIIBrown, John Victim JJJBrown, John Father JJJBrown, Jane Mother JJJBrown, John Father LLLBrown, Jane Mother LLLBrown, John Brother1 LLLBrown, John Father MMMBrown, Jane Mother MMMBrown, John Father NNNBrown, and Jane Mother NNNBrown.

[18] Plaintiffs bring claims for both IIED (in association with directly injured victims or the immediate family member of such victims) and wrongful death (on behalf of victims killed in one of the attacks).  All of the wrongful death claims, *see* Compl. ¶¶ 8, 15, 26, 31, 40, 49, 55, 63, 70, 76, involve estates governed by Virginia, Texas, Syrian, and Lebanese law, *supra* notes 8–9, 15, 17.  Thus, the Court's discussion of the law of all other jurisdictions considers only whether the law of the relevant state provides for a personal injury action for IIED and/or solatium.

3.  Estates Governed by Virginia Law

The estate of John VictimVBrown is governed by Virginia law and is associated with an individual who was injured in both the 1983 and 1984 attacks.  R. & R. ¶ 1242.  The estate of Virginia Glover Maxwell is governed by Virginia law and is associated with an individual whose son (Ben Henry Maxwell) was killed in the 1983 attack.  R. & R. ¶ 34.  The estate of Jane Wife MBrown is governed by Virginia law and is associated with an individual whose husband (John Victim MBrown) was injured in the 1983 attack.  R. & R. ¶ 963.  The estate of Jane Wife VBrown is governed by Virginia law and is associated with an individual whose husband (John Victim VBrown) was injured in both the 1983 and 1984 attacks.  R. & R. ¶ 1256.  The estates of John Joseph Hussey, Jr., and Jeannette Marie Hussey are governed by Virginia law and are associated with individuals whose son (Peter James Hussey) was injured in the 1984 attack.  R. & R. ¶¶ 851, 857.

Virginia law provides that "a decedent's estate [may] maintain any cause of action that the decedent would have been able to assert during his or her life (e.g., battery or IIED)."  *Lelchook II*, 2019 WL 2191177, at *1 (quoting *Dammarell IV,* 404 F. Supp. at 297).  Accordingly, the six estates listed in the preceding paragraph have standing to pursue claims for physical or emotional injuries that the Plaintiffs could have pursued during their lifetime.

Separately, the estate of Ben Henry Maxwell is governed by Virginia law and is associated with an individual who was killed in the 1983 attack.  R. & R. ¶ 18.  "Virginia permits the personal representative of a deceased individual to bring an action against any person or persons (including corporations or other legal entities) whose wrongful conduct caused the decedent's death."  *Dammarell IV,* 404 F. Supp. at 297.  That being so, Ben Henry Maxwell's estate has standing to assert a wrongful death claim.

### 4. Estate Governed by Texas Law

The estate of Raymond Joseph Piascik is governed by Texas law and is associated with an individual whose daughter (Lisa Ann Piascik) was injured in the 1983 attack.  R. & R. ¶ 879.  Texas state law provides that a so-called "survival" "cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person."  Tex. Civ. Prac. & Rem. § 71.021(a).  "A decedent's personal injury action therefore survives death and may be prosecuted on [his] behalf."  *Taylor*, 811 F. Supp. 2d at 13 (quoting *Elliott v. Hollingshead*, 327 S.W.3d 824, 833 (Tex. App. 2010)); *see also Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005) ("Because a decedent's survival claim becomes part of her estate at death, it follows that the estate retains a justiciable interest in the survival action.").  Accordingly, the estate of Raymond Joseph Piascik has standing to pursue any personal injury claims that the Plaintiff could have pursued during his lifetime.  *See Barry II*, 437 F. Supp. 3d at 39 (holding that estates associated with the brother and sister of "an individual who was injured in the 1983 attack" had standing to pursue claims under Texas law).

Furthermore, the estate of Richard Twine is also governed by Texas law and is associated with an individual who was killed in the 1983 attack.  R. & R. ¶ 78.  His estate is represented by his son, James Charles Twine.  Compl. ¶¶ 15, 17; R. & R. ¶ 78.  Texas law provides that the "surviving spouse, children, and parents of the deceased may bring [an action for wrongful death] . . . for the benefit of all," or "[i]f none of the individuals entitled to bring an action have begun the action within three calendar months after the death of the injured individual, his executor or administrator shall bring and prosecute the action unless requested not to by all those individuals."  Tex. Civ. Prac. & Rem. § 71.004.  As the personal representative of Richard Twine's estate, James Charles Twine (his son) is the "proper plaintiff to bring a wrongful death

23

action under Texas law," *Heiser I*, 466 F. Supp. 2d at 334, and therefore has standing to assert a wrongful death claim.

### 5. Estate Governed by Pennsylvania Law

The estate of Albert Nicholas Alexander is governed by Pennsylvania law and is associated with an individual who was injured in the 1983 attack. R. & R. ¶ 791. Under Pennsylvania law,

> "[a]ll causes of action or proceedings shall survive as provided in [§ 8302]," 20 Pa. Cons.Stat. § 3371, and that separate provision specifies that "[a]ll causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant." 42 Pa. Cons.Stat. § 8302. As the Supreme Court of Pennsylvania has explained, these statutes "do not create a new cause of action [but] simply permit a personal representative to enforce a cause of action which had already accrued to the deceased before his death."

*Taylor*, 811 F. Supp. 2d at 13 (quoting *Anthony v. Koppers Co.*, 436 A.2d 181, 185 (Pa. 1981)). Accordingly, the estate governed by Pennsylvania law has standing to pursue personal injury claims that the Plaintiff could have pursued during his lifetime.

### 6. Estate Governed by New Jersey Law

The estate of John Victim NNBrown is governed by New Jersey law and is associated with an individual who was injured in the 1984 attack. R. & R. ¶ 2072. "New Jersey's Survival Act allows '[e]xecutors and administrators' of a decedent's estate to bring actions for damages for 'any trespass done to the person or property' of the decedent—before his death—that the decedent could have brought if he were still living." *Hunter v. Dematic USA*, No. 16-00872 (WHW) (CLW), 2016 WL 3410165, at *4 (D.N.J. June 15, 2016) (quoting N.J. Stat. § 2A:15-3). New Jersey courts, both federal and state, have clarified that "[t]he term 'trespass' in the [survival] statute is equated with 'tort,'" and have further emphasized that the scope of the statute "should not be modified by implication to exclude torts in which damages for emotional distress, not physical injury, are sought." *Hawes v. Johnson & Johnson*, 940 F. Supp. 697, 700 (D.N.J.

1996) (quoting *Canino v. New York News, Inc.*, 475 A.2d 528, 531 (N.J. 1984)).  The estate governed by New Jersey law may, therefore, pursue any tort claims that the Plaintiff could have pursued were he still alive.

### 7.  Estate Governed by Michigan Law

The estate of John Victim KKKBrown is governed by Michigan law and is associated with an individual who was injured in both the 1983 and 1984 bombings.  R. & R. ¶ 3112.  "Under Michigan state law . . . the general rule is that all actions and claims survive death."  *Barry II*, 437 F. Supp. 3d at 38 (cleaned up).  There is an exception, however, "for a wrongful death action seeking to recover an injury that resulted in death, which 'shall not be prosecuted after the death of the injured person except' as statutorily prescribed."  *Id.* (quoting Mich. Comp. Laws § 600.2921).  Here, there are no allegations that the injuries the Plaintiff sustained in the 1983 and 1984 bombings caused his death, and thus the rule rather than the exception controls.  His estate therefore has standing under Michigan law.

### 8.  Estates Governed by South Carolina Law

The estates of Tommie Franklin Brant and Ann Wooten Brant are governed by South Carolina law and are associated with individuals whose son (Russell Franklin Brant) was injured in the 1984 attack.  R. & R. ¶¶ 668, 674.  Under South Carolina law "[c]auses of action for . . . any and all injuries to the person . . . shall survive both to and against the personal or real representative . . . of a deceased person."  *Anderson v. The Islamic Republic of Iran*, 753 F. Supp. 2d 68, 83–84 (D.D.C. 2010) (quoting S.C. Code Ann. § 15–5–90).  The state's highest court "has explained that this survivability statute 'has a wide ambit,' and that, '[g]enerally, any cause of action which could have been brought by the deceased in his lifetime survives to his representative.'"  *Id.* (quoting *Ferguson v. Charleston Lincoln Mercury, Inc.*, 564 S.E.2d 94, 96–

97 (S.C. 2002)).  The estates governed by South Carolina law thus have standing to pursue a cause of action for injuries that the now-deceased Plaintiffs could have brought while they were alive.

### 9.  Estate Governed by Minnesota Law

The estate of Evelyn Betty Middleton is governed by Minnesota law and is associated with an individual whose son (Richard James Browning) was injured in the 1983 attack.  R. & R. ¶ 639.  Minnesota law provides that "[a] cause of action arising out of an injury to the person dies with the person of the party in whose favor it exists. . . . All other causes of action by one against another, whether arising on contract or not, survive to the personal representatives of the former."  *Taylor*, 811 F. Supp. 2d at 13 (quoting Minn.Stat. § 573.01 (2010)).  As another court in this district previously explained, "the Minnesota Supreme Court has acknowledged that 'the modern trend is that tort causes of action and liabilities are as fairly a part of the estate . . . as contract debts.'"  *Id.* (quoting *Johnson v. Consolidated Freightways, Inc.*, 420 N.W.2d 608, 612 (Minn. 1988)).  Accordingly, the estate governed by Minnesota law has standing to pursue a tort cause of action that Plaintiff could have pursued during her lifetime.

### 10.  Estate Governed by Syrian Law

Turning now to foreign law, Syrian laws of inheritance govern the claims of the estate of John Victim Brown, an individual who was killed in the 1983 attack.[19]  R. & R. ¶ 175.  His

---

[19] "To determine questions of foreign law such as those at hand (the standing of estates created under Syrian[,] [United Kingdom] and Lebanese law), Federal Rule of Civil Procedure 44.1 permits courts determining foreign law to consider any relevant material or source, including testimony, whether or not admissible under the Federal Rules of Evidence."  *Barry II*, 437 F. Supp. 3d at 39 n.26 (cleaned up).  The Plaintiffs have provided a legal opinion on Syrian law, the law that governs the estate of John Victim Brown.  *See* Pls.' Mot., Ex. 1, Legal Opinion on Certain Issues Regarding Syrian Law ("Legal Opinion on Syrian Law"), ECF No. 29-2.  The Plaintiffs indicate therein the qualifications of the expert, and the filing satisfies the Court that the author of this opinion is qualified to testify as an expert, as Federal Rule of Evidence 201

estate is represented by his son, John Son1 Brown, *id.* ¶¶ 175, 186, and seeks to recover

economic damages stemming from John Victim Brown's wrongful death as well as

compensation for the pain and suffering John Victim Brown experienced before his passing,

Compl. ¶ 26, R. & R. ¶¶ 176, 3393.  Under Syrian law, Article 223(2) of the Syrian Civil Code

permits "the heirs of a decedent [to] assert a claim for wrongful death of the decedent" and, in

doing so, to recover "economic losses by the decedent" on "behalf of the estate."  Legal Opinion

on Syrian Law 2.  Moreover, Syrian law states that "heirs of a decedent may assert a claim for

compensation for pain and suffering experienced by a decedent as a result of physical injuries,

including physical injuries which ultimately cause the death of the decedent."  *Id.*  All that being

so, the estate governed by Syrian law has standing to bring claims to seek compensation for

Plaintiff's wrongful death, as well as his pain and suffering.

### 11.  Estates Governed by United Kingdom Law

The estates of Charles James Twine and Violet Elsie Twine are governed by United

Kingdom law and are associated with individuals whose son (Richard Twine) was killed in the

1983 attack.  R. & R. ¶¶ 127, 133.  Plaintiffs assert that, under United Kingdom law, "'all causes

of action . . . vested in' a person survive the death of that person 'for the benefit of' the estate,

and can be brought by an estate representative."  Pls.' Mot. at 15 (quoting Law Reform

(Miscellaneous Provisions) Act 1934, 24 & 25 Geo. 5 c. 41, § 1 (UK)).  But aside from this

unadorned citation to the Law Reform (Miscellaneous Provisions) Act of 1934, Plaintiffs cite no

authority—nor do they attach a legal opinion—that persuasively establishes that English law

provides a cause of action that would enable the parents of a deceased individual to recover

---

requires. Thus, the Court's analysis of the standing of the estate governed by Syrian law
considers the legal opinion that the Plaintiffs have provided.

emotional damages in connection with the death of their child in a different country.  *Cf. Roberts v. Islamic Republic of Iran*, No. 20-CV-1227-RCL, 2023 WL 4351468, at *6–9 (D.D.C. July 5, 2023) (explaining that "English common law does not provide a viable avenue" for family member plaintiffs to recover for "psychiatric injury" where family member claimants were not "in close proximity in space and time to the incident or its immediate aftermath" (internal citations omitted)).  The Court does not discount the possibility that English law does provide a cause of action through which Charles James Twine and Violet Elsie Twine could have sought to recover for the emotional injury caused by the death of their son.  However, because it is currently unclear whether English law provides such a cause of action that would then survive to the benefit of the estate, Plaintiffs have not established the requisite standing for the estates governed by United Kingdom law.  Accordingly, the claims of the estates governed by United Kingdom law are denied without prejudice.

### 12.  Estates Governed by Lebanese Law

The various estates governed by Lebanese law assert claims for (1) "physical and emotional pain and suffering of a direct victim who later passed away," (2) "emotional injuries caused by the injury to or death of an immediate family member of a victim who later passed away," and (3) "wrongful death of direct victims who died in the Attacks."  Pls.' Mot. at 18. Regarding the first category of claims, "Lebanese law . . . permits direct victims to bring claims for mental distress as well as physical or economic damage."  *Bathiard v. Islamic Republic of Iran*, No. 16-CV-1549 (CRC), 2020 WL 1975672, at *2 (D.D.C. Apr. 24, 2020) (internal quotation marks omitted).  "'Upon the death of the original claimant,' the distress or physical or economic damage that the claimant suffered is 'considered to be "automatically transferred to his

or her heirs by operation of law," authorizing the heirs to assert the claim for compensation on behalf of the decedent.'" *Id.* (quoting *Barry II*, 437 F. Supp. 3d at 42).

As for the second category of claims, this Court has previously explained that "Lebanese law both recognizes a cause of action for the emotional distress caused by the death or injury of an immediate family member and provides that a claim for compensation for such emotional distress survives the passing of the individual and may be asserted by the decedent's heir(s)." *Barry II*, 437 F. Supp. 3d at 42. To be more specific, under "Article 134 of the Code of Obligations and Contracts, emotional distress may be compensated provided that the claimant and the initial victim share either a legitimate kinship based on an immediate family relationship or a marriage alliance." *Id.* (internal quotation marks and alterations omitted). "Where such a relationship or a marriage alliance exists, upon the death of the original claimant, the emotional distress that the claimant suffered is considered to be automatically transferred to his or her heirs by operation of law, authorizing the heirs to assert the claim for compensation on behalf of the decedent." *Id.* (internal quotation marks omitted). In other words, "'Lebanese law allows for the award of compensation for "moral damages," such as emotional distress, suffered as the result of the wrongful death or tortious injury of an immediate relative,' and the estate of the original claimant has standing to pursue the claim." *Id.* (quoting *Estate of Doe I*, 808 F. Supp. 2d at 21). All that being so, to the extent the estates governed by Lebanese law assert claims either for physical or emotional injury suffered by now-deceased victims of the attacks or for emotional injuries caused by the injury to, or death of, an immediate family member, those estates have standing to pursue the claims of the deceased Plaintiffs.

Finally, as the Plaintiffs note, this Court has previously accepted the standing of estates governed by Lebanese law to assert wrongful death actions. *See id.* at 37 n.23 ("All of the

wrongful death claims involve estates governed by Lebanese law." (citations omitted)); *id.* at 46 (holding that "the directly-injured Smith Plaintiffs have established liability for their wrongful death claim"). The Court therefore continues to conclude that estates created under Lebanese law have standing to assert wrongful death claims. The Court next considers what legal standard governs Plaintiffs' claims.

## C. Liability

With these jurisdictional matters in hand, the Court is now ready to address the question of liability. As the Court explained in *Barry I*, "although section 1605A creates a private right of action for claimants who meet its other requirements, a FSIA plaintiff must further prove a theory of liability to establish a claim for relief that entitles them to damages." 410 F. Supp. 3d at 176 (cleaned up); *see also Owens II*, 864 F.3d at 807 ("[T]he question [of] whether a statute withdraws sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action." (citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994); *United States v. Mitchell*, 463 U.S. 206, 218 (1983))). As detailed below, the theory of liability that each Plaintiff may raise depends on the claimant's identity. Again, Plaintiffs fall into two categories: (1) Plaintiffs who were directly injured in one or both of the attacks, and (2) the immediate family members of these individuals, the majority of whom are not U.S. nationals. For the following reasons, all Plaintiffs (besides the estates governed by United Kingdom law, as discussed above) state a valid claim under the FSIA, though the formal means by which the two categories of Plaintiffs do so is distinct.[20]

---

[20] For concision, the Court uses the term "Plaintiff" or "Plaintiffs" to refer both to plaintiffs who pursue claims in their individual capacity and those who are represented by a third party acting on behalf of a deceased individual's estate or on behalf of a legally incapacitated individual.

1.  Directly Injured Plaintiffs

The directly injured Plaintiffs' claims are directly governed by the FSIA's private right of action.  This private right of action, codified in its present form at section 1605A(c), "limits claimants" to individuals who, at the time of the attack, fell within a category enumerated by the statute, or the legal representative of such an individual.  *See Owens II*, 864 F.3d at 805, 807 ("[Section] 1605A(c) authorizes a cause of action not only for . . . [the enumerated] groups but also for the legal representative of a member of those groups.").  The enumerated categories, as relevant here, cover members of the armed forces or "an employee of the Government of the United States, or . . . an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."  28 U.S.C. § 1605A(c)(3).  As Plaintiffs state, and as the Court's review of the Special Master's findings of fact confirm, the individuals who seek relief based on the direct injury to them during the attack fall within this provision.  *See generally* R. & R.  Thus, these Plaintiffs may draw directly on section 1605A(c) to establish a cause of action, but still must establish the theoretical basis that underpins the allegation of liability.

Plaintiffs who seek relief in section 1605A actions "'generally' turn to 'the lens of civil tort liability'" to articulate the "justification for such recovery."  *Barry I*, 410 F. Supp. 3d at 176 (quoting *Rimkus*, 750 F. Supp. 2d. at 175–76); *see also, e.g.*, *Schertzman Cohen*, 2019 WL 3037868, at *5.  "Based on the D.C. Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts . . . ' to define the elements and scope of these theories of recovery."  *Worley*, 75 F. Supp. 3d at 335 (quoting *Oveissi III*, 879 F. Supp. 2d at 54); *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) ("The courts are not authorized to craft a body of federal

common law in deciding FSIA terrorism exception cases.  However, a district court may rely on

well-established statements of common law . . . ." (citing *Bettis v. Islamic Republic of Iran*, 315

F.3d 325, 333 (D.C. Cir. 2003))).  As it did in *Barry I* and *Barry II*, the Court follows this

approach to address the claims of Plaintiffs who fall within section 1605A's enumerated

categories.

Plaintiffs' complaint requests relief under several common law theories of liability.[21]

Two are relevant for the Court's analysis of liability with respect to the directly injured Plaintiffs.

First, Plaintiffs allege intentional infliction of emotional distress caused by "[t]he acts of

detonating an explosive device at the U.S. Embassy in Lebanon on April 18, 1983, and the U.S.

---

[21] In addition to the causes of action discussed in the body of this opinion, Count I seeks compensatory damages pursuant to "28 U.S.C. § 1605A(c), Private Right of Action."  Compl. ¶¶ 434–440.  As discussed above and in *Barry I* and *Barry II*, the FSIA "'provides a private right of action' without any 'guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages.'"  *Barry I*, 410 F. Supp. 3d at 177 (quoting *Braun*, 228 F. Supp. 3d at 78).  The text of Count I alleges that Plaintiffs "suffered, *inter alia*, death, physical pain and suffering, mental anguish, emotional pain and suffering, loss of solation [sic], loss of consortium, and/or economic losses," Compl. ¶ 438, and seeks compensatory damages for these injuries, *id.* ¶ 440.  Because these claims for relief and the underlying factual allegations overlap with the other counts of Plaintiffs' complaint, and because a plaintiff may not recover twice for allegations that arise from the same predicate acts, *see Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976), the Court does not read Count I as presenting a separate theory of liability for any of Plaintiffs and considers it no further.  Although Plaintiffs present alternative theories of § 1605A(c) liability in their motion for default judgment based on assault or battery as opposed to IIED or wrongful death, *see* Pls.' Mot. at 20–21 (arguing that Iran is liable under § 1605A(c) causes of action based on all four underlying tort theories), Plaintiffs' claims and facts focus more on IIED and wrongful death.  For example, the complaint includes a separate IIED count alleging that "[all] Plaintiffs suffered severe emotional distress" and a separate wrongful death count, but the complaint does not have one for assault or battery.  Compl. ¶¶ 441–451.  This is similar to *Barry II*, where the directly injured plaintiffs recovered under only IIED and wrongful death theories despite many of those plaintiffs likely having suffered assault or battery.  *See* 437 F. Supp. 3d at 32, 44–46 (using only IIED and wrongful death as underlying tort theories for § 1605A(c) claims even though "each of the directly-injured Smith Plaintiffs suffered physical injury such as head trauma, loss of hearing, severe lacerations," and, for nine of the plaintiffs, death).  Regardless, even if the Court also analyzed assault and battery, "plaintiffs who have claimed assault, battery, and IIED [under the FSIA-created cause of action] may recover under only one of any such theories, as multiple recovery is prohibited."  *Valore*, 700 F. Supp. 2d at 77.

Embassy Annex on September 20, 1984."[22]  Compl. ¶¶ 441–446.  Second, the personal

representatives of those fatally injured in one of the attacks bring "wrongful death" claims and

seek to recover damages for Defendant's conduct.  *Id.* ¶¶ 447–451.  The Court considers each

basis for liability in turn.

### a.  IIED Claims of Directly Injured Plaintiffs

Taking the IIED claims first, general principles of tort law provide that "a defendant is

liable for IIED if its 'extreme and outrageous conduct intentionally or recklessly causes severe

emotional distress' to a plaintiff."  *Barry I*, 410 F. Supp. 3d at 177 (quoting Restatement

(Second) of Torts § 46(1)); *see also Roth*, 78 F. Supp. 3d at 400 (quoting *Estate of Heiser v.*

*Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 26 (D.D.C. 2009)).  The same

analysis that this Court applied in *Barry I* with respect to the Barry Plaintiffs and *Barry II* with

respect to the directly injured Smith Plaintiffs applies with equal force for the directly injured

Plaintiffs.  Here, as there, "the first element of the IIED tort—an extreme or outrageous act that

is intended to cause severe emotional distress—is plainly met" because an act of terrorism is,

"[b]y its very definition, . . . 'extreme and outrageous and intended to cause the highest degree of

emotional distress.'"  *Barry I*, 410 F. Supp. 3d at 177 (quoting *Valore*, 700 F. Supp. 2d at 77);

---

[22] Plaintiffs also move, under a separate count, for compensatory damages for loss of solatium and/or loss of consortium.  Compl. ¶¶ 452–456.  Because, "[i]n the context of a suit under the FSIA, courts in this Circuit have found IIED and solatium claims to be 'indistinguishable,'" *Lelchook v. Syrian Arab Republic* ("*Lelchook III*"), No. CV 16-1550 (RC), 2019 WL 4673849, at *4 (D.D.C. Sept. 25, 2019) (quoting *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009)), and because, "[w]here there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues," *Kassman*, 546 F.2d at 1034, the Court considers only the IIED count with respect to all of Plaintiffs.  The Court separately discusses solatium as a remedy authorized by the FSIA *infra* Part IV.D.  *See* 28 U.S.C. § 1605A(c)(4) (stating that damages in suit pursuant to the statute's private cause of action "may include economic damages, solatium, pain and suffering, and punitive damages").

*see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  Accordingly, the Court finds it self-evident that Iran's role in both the 1983 and 1984 bombings was "intended to cause the highest degree of emotional distress[:]" "terror."  *Heiser II*, 659 F. Supp. 2d at 26.

Plaintiffs have, moreover, satisfied the second element of an IIED tort, which requires evidence that Iran's provision of material support or resources for the attacks caused them "severe emotional distress."  The Special Master's findings of fact make clear that the attack directly caused a grave immediate and ongoing psychological toll.  *See generally* R. & R.  Based on the undisputed record before it, the Court finds that these materials "establish . . . [the directly injured Plaintiffs'] claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), in the manner that the FSIA demands.  Thus, applying general IIED tort law principles in the FSIA context, the Court concludes that the directly injured Plaintiffs have established liability for this aspect of their claim.

### b. Wrongful Death Claims of Directly Injured Plaintiffs

The estates of ten individuals killed in one of the attacks also pursue relief under a wrongful death cause of action.  Compl. ¶¶ 8, 15, 26, 31, 40, 49, 55, 63, 70, 76.  A wrongful-death action is one brought by a decedent's heirs at law, and may be brought through the estate of the decedent, "for economic losses which result from a decedent's premature death."  *Roth*, 78 F. Supp. 3d at 400 (quoting *Valore*, 700 F. Supp. 2d at 78); *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998).  General tort law principles provide that "[v]ictims may recover for their wrongful deaths if they can establish that the defendant[] caused their deaths."  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 39 (D.D.C. 2016).

A number of courts in this district have applied those general principles in the context of FSIA suits.  *See, e.g.*, *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 139

(D.D.C. 2018) (citing Restatement (Second) of Torts § 925); *Braun*, 228 F. Supp. 3d at 79;

*Thuneibat*, 167 F. Supp. 3d at 39; *Valore*, 700 F. Supp. 2d at 78; *see also* Restatement (Second)

of Torts § 925, cmt. a (discussing the history of wrongful death at common law and noting that

an 1846 English statute was enacted to provide personal representatives of deceased parties with

"a cause of action against the one who tortiously caused the death, provided that the deceased

would have had a cause of action if he had been merely injured and not killed").  Applying that

analysis here, for the reasons detailed in the Court's analysis of the FSIA's waiver of sovereign

immunity, *supra* Part IV.A.1.b, the Court finds that Plaintiffs fatally injured in one of the attacks

have established that Defendant caused their deaths.  Furthermore, each of the claims is

presented by the personal representative of that fatally injured individual's estate.  Thus, the

directly injured Plaintiffs have established liability for their wrongful death claim.

Accordingly, all of the directly injured Plaintiffs have provided evidence to support entry

of default judgment in their favor for both their IIED and wrongful death claims.

### 2. Immediate Family Member Plaintiffs[23]

The Court is thus left with the claims of the immediate family members, who (with the

exception of several U.S. nationals) do not fall within the enumerated section 1605A(c)

categories.[24]  As the *Estate of Doe I* court explained, although "those plaintiffs who are foreign

---

[23] Because, as the Court established above, the wrongful death actions are brought "through the estate of the decedent," *Valore*, 700 F. Supp. 2d at 78 (citing *Flatow*, 999 F. Supp. at 27), and not on behalf of the immediate family member plaintiffs (all of whom bring independent claims in association with the claims of an immediate family member who was directly harmed by one or both attacks), only the IIED cause of action is relevant for this category of Plaintiffs.

[24] Plaintiffs' filings and the Special Master's findings of fact suggest that some immediate family member Plaintiffs were U.S. nationals at the time of the attack.  *See, e.g.*, Compl. ¶ 10 ("Virginia Glover Maxwell, now deceased, was the mother of Ben Henry Maxwell, who was killed as a result of the 1983 Beirut Embassy bombing.  Virginia Glover Maxwell was, at the time of the acts alleged herein, a U.S. citizen domiciled in Virginia.").  Such individuals

national family members of victims of the terrorist attacks in Beirut lack a federal cause of action[,] . . . they may continue to pursue claims under applicable state and/or foreign law." 808 F. Supp. 2d at 20. This is so because section 1605A's creation of a new cause of action "did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." *Id.* (citing *Simon v. Republic of Iraq*, 529 F.3d 1187, 1192 (D.C. Cir. 2008), *rev'd on other grounds*, 556 U.S. 848 (2009)); *see also* 28 U.S.C. § 1606 (stating that, once waiver of sovereign immunity is established under section 1605, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances"); *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 573 F.3d 835, 841 (D.C. Cir. 2009) (quoting 28 U.S.C. § 1606). Thus, the Court will evaluate whether Plaintiffs have established liability under the relevant substantive standard. That substantive standard must be determined by a choice of law analysis. But this Court in *Barry II* already conducted a choice of law analysis using very similar facts to conclude that D.C. standards of liability should be applied. *See Barry II*, 437 F. Supp. 3d at 47–50. The Court adopts the *Barry II* analysis to conclude the same.

The Court next applies District of Columbia law to the immediate family members' claims for intentional infliction of emotional distress.[25] "D.C. law [for an IIED claim] enables foreign-national family members of terrorist attack victims, including spouses, to recover

_____

fall within section 1605A(c)'s enumerated categories in the manner discussed above for the directly injured Plaintiffs. However, because—as the Court discusses next—the substantive IIED theory of relief that applies to U.S. national immediate family members is functionally identical to the substantive IIED theory of relief that applies to non-U.S. national immediate family members, the Court addresses these individuals' claims together in the following analysis.

[25] For the reasons discussed above, this is the only theory of liability that (1) pertains to this category of individuals and (2) is not duplicative of the underlying basis of the IIED claim for relief.

solatium damages when their allegations are reinforced by the evidence." *Cohen*, 238 F. Supp. 3d at 86 (citing *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 89–90 (D.D.C. 2014)).  The District of Columbia Court of Appeals has confirmed that the IIED elements established in the Restatement (Second) of Torts provide the proper standard to apply.  *Republic of Sudan v. Owens* ("*Owens III*"), 194 A.3d 38, 41 (D.C. 2018).[26]  As the *Owens III* court explained, the "elements of an IIED claim arising from injury to a member of the plaintiff's immediate family" are established by section 46 of the Restatement, which sets out the following elements of IIED liability:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
>> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>>
>> (b) to any other person who is present at the time, if such distress results in bodily harm.

*Id.* (quoting Restatement (Second) of Torts § 46 (1965)).

Affirming that the D.C. Court of Appeals "has embraced the Restatement Second's approach to IIED liability," *id.*, the *Owens III* court went on to clarify that a claimant who alleges emotional distress arising from a terrorist attack that injured or killed a family member need not have been present at the scene of the attack to state a cognizable IIED claim for relief, *see id.* at

---

[26] In *Owens III*, the D.C. Court of Appeals answered a question that the Circuit certified to it in *Owens II*: "Must a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress?"  *Owens III*, 194 A.3d at 41 (quoting *Owens II*, 864 F.3d at 812).

42–45.  In other words, the court "held that when emotional distress is caused by conduct directed at a member of a plaintiff's family, the plaintiff must," as a general rule, be "'present at the time' of the conduct in order to make out an IIED claim," but also "carved out" what it called "'the FSIA Terrorism Exception' to the presence requirement" in the limited context of "cases brought under § 1605A."  *Owens v. Republic of Sudan* ("*Owens IV*"), 924 F.3d 1256, 1259 (D.C. Cir. 2019) (quoting *Owens III*, 194 A.3d at 41–42).  It found this exception to be permitted by the comments to the Restatement itself.  *See Owens III*, 194 A.3d at 42 (citing Restatement (Second) of Torts § 46 (1965) Caveat & cmt. *l*).  Thus, *Owens III* confirms that the same general principles of tort law that govern the claims brought by the directly injured Plaintiffs within one of 1605A's enumerated categories also govern claims brought by the immediate family member Plaintiffs who pursue their claims via District of Columbia law.

Applying these principles to the family member Plaintiffs, the Court finds entry of default concerning liability appropriate with respect to their IIED claims for the same reasons identified previously with respect to the directly injured Plaintiffs.  Here, it is again abundantly clear from the facts available to the Court that Iran's role in the 1983 and 1984 bombings was "intended to cause the highest degree of emotional distress[:]" "terror," *Heiser II*, 659 F. Supp. 2d at 26, and the Special Master's findings of fact again detail how one or both attacks created immediate and ongoing pain and suffering for the family member Plaintiffs, *see generally* R. & R.  Thus, based on the undisputed record before it, the Court finds that these materials "establish . . . [the family member Plaintiffs'] claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), and concludes that the family member Plaintiffs (except the two estates governed by United Kingdom law) have established liability for their IIED claims.

### D. Damages

Having granted default judgment on liability for all but two Plaintiffs, the remaining issue

facing the Court is the proper measure of damages to award.  "The FSIA's private cause of

action permits plaintiffs to seek 'economic damages, solatium, pain and suffering, and punitive

damages.'"  *Barry I*, 410 F. Supp. 3d at 179 (quoting 28 U.S.C. § 1605A(c)).[27]  Here, all

Plaintiffs seek compensatory damages for "severe emotional distress" under an IIED cause of

action, *see* Compl. ¶¶ 441–446, and the personal representatives of the individuals who were

fatally wounded in one of the attacks also seek economic damages under a wrongful death cause

of action, *id.* ¶¶ 447–451.[28]  In addition, Plaintiffs seek an award of prejudgment interest on all

damages.  *Id.* at 166.  Special Master Griffin has appraised the material submitted by all

Plaintiffs, including "signed, sworn affidavits, publicly available information, and an expert

report regarding economic damages."  R. & R. ¶ 6.  Using this information to "independently and

holistically evaluate each claim for damages based on the contemporary statutory framework and

---

[27] The FSIA requires plaintiffs to make an adequate evidentiary showing before a court may award damages: "To obtain damages against defendants in a FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of the damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages.'"  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill*, 328 F.3d at 681); *see also Wultz*, 864 F. Supp. 2d at 37.  For the reasons discussed previously, Plaintiffs have established that Iran's provision of material support and resources for an act of extrajudicial killing was intended to injure individuals at the Embassy and Annex.  Thus, they have discharged their burden of proof to show that the consequences of Iran's act were reasonably certain, and the sole question for this Court is the damages amount.

[28] Again, Plaintiffs also move under two other theories: count I directly invokes section 1605A(c)'s private right of action, Compl. ¶¶ 434–440, and count IV seeks relief under a solatium/loss of consortium theory of relief, *id.* ¶¶ 452–456.  Because these theories overlap with the IIED and wrongful death claims, and because, "[w]here there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues," *Kassman*, 546 F.2d at 1034, the Court considers only the IIED and wrongful death theories of relief in its assessment of damages.

associated body of caselaw," *id.* ¶ 3389 (quoting Sealed Mem. Op., *Jones v. Islamic Republic of Iran*, No. 20-cv-00850 (RC), ECF No. 43 at 36 (D.D.C. June 13, 2022)), Special Master Griffin has recommended damages awards for each of the Plaintiffs' claims for relief, *see generally* R. & R., App. A, ECF No. 34-1.  Pursuant to Federal Rule of Civil Procedure 53(f), the Plaintiffs have moved the Court to adopt these recommendations, and Iran has not filed an objection.[29] *See* Pls.' Mot. Adopt Special Master's R. & R., ECF No. 35; *see also* Fed. R. Civ. P. 53(f)(2) ("A party may file objections to—or a motion to adopt or modify—the master's order, report, or recommendations no later than 21 days after a copy is served, unless the court sets a different time.").  Last, Plaintiffs move for an award of punitive damages.  *See* Pls.' Mot. at 24–27.  For the following reasons, the Court adopts many, but not all, of the Special Master's recommendations, enters judgment concerning damages as enumerated in the attached Appendix, and awards punitive damages as discussed below.

### 1.  Compensatory Damages[30]

#### a.  Legal Standard for Compensatory Damages under the FSIA

As other courts addressing similar suits under the FSIA have observed, "it is undeniably difficult to assess the amount of compensatory damages for the pain and suffering of surviving

---

[29] The Rules also require the Court to "give the parties notice and an opportunity to be heard" before "acting on a master's order, report, or recommendation." Fed. R. Civ. P. 53(f)(1).  Here, notice was provided when the Special Master filed his report on the docket.  Additionally, the Special Master's report and recommendation appears to be very similar to Plaintiffs' Proposed Findings of Fact and Conclusions of Law that they filed on the docket over seven months ago.  Pls.' Proposed F.F. & C.L., ECF No. 30.

[30] Again, "courts in this Circuit" addressing claims under the FSIA "have found IIED and solatium claims to be 'indistinguishable.'"  *Lelchook III*, 2019 WL 4673849, at *4 (quoting *Heiser II*, 659 F. Supp. 2d at 27 n.4).  Technically speaking, the FSIA authorizes the award of solatium damages to redress IIED claims for relief.  *See* 28 U.S.C. § 1605A(c)(4) ("[D]amages may include economic damages, solatium, pain and suffering, and punitive damages.").  The Court's analysis of IIED damages thus takes into account "prior decisions awarding damages for intentional infliction of emotional distress as well as decisions regarding solatium." *Valore*, 700

victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010) (internal quotation marks omitted) (quoting *Brewer*, 664 F. Supp. 2d at 57).  Because of the importance of ensuring "that individuals with similar injuries receive similar awards," *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), *abrogation on other grounds recognized by Mohammadi*, 947 F. Supp. 2d at 67 n.16, courts in this jurisdiction confronting FSIA claims have developed a framework for the calculation of compensatory damages, *see Valore*, 700 F. Supp. 2d at 83–84. Although the so-called *Heiser* framework, first set forth in *Heiser I*, 466 F. Supp. 2d 229, is non-binding, it provides baseline figures and a basic methodology by which to ascertain the "appropriate measure of damages" both for directly injured victims and for "the family members of victims who died" or were injured in a terrorist attack.  *Lelchook III*, 2019 WL 4673849, at *4 (quoting *Peterson*, 515 F. Supp. 2d at 51, 54); *see also, e.g.*, *Valore*, 700 F. Supp. 2d at 85–86 (noting "strong precedential support" for framework); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57–58 (D.D.C. 2009); *Heiser II*, 659 F. Supp. 2d at 27 n.4.  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case."  *Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Under the *Heiser* framework, a court begins with baseline amounts and may adjust upward or downward to account for individual circumstances.  For a directly injured claimant, "[c]ourts generally 'begin[] with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages.'"  *Barry I*, 410 F.

---

F. Supp. 2d at 85 (quoting *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008)); *see also Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006).

Supp. 3d at 180 (quoting *Wultz*, 864 F. Supp. 2d at 37–38).  An upward adjustment to the $7 to

$12 million range may be appropriate "in more severe instances of physical and psychological

pain, such as where victims suffered relatively more numerous and severe injuries, were

rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead."  *Valore*, 700

F. Supp. 2d at 84.  Conversely, a downward departure to the $1.5 million to $3 million range

may be appropriate "where victims suffered relatively more minor injuries, such as 'minor

shrapnel injuries,' or 'severe emotional injury accompanied by relatively minor physical

injuries.'"  *Barry I*, 410 F. Supp. 3d at 180 (first quoting *Valore*, 700 F. Supp. 2d at 84, then

quoting *Estate of Doe v. Islamic Republic of Iran* ("*Estate of Doe II*"), 943 F. Supp. 2d 180, 186

(D.D.C. 2013)).  Such awards for physical injuries "assume severe psychological injuries."

*Schertzman Cohen*, 2019 WL 3037868, at *6 (citing *Wamai*, 60 F. Supp. 3d at 92–93).

However, if a directly injured claimant suffered *only* emotional injuries (as opposed to both

physical and emotional injuries), this Court has applied a slightly modified framework that

assumes a baseline compensatory award of $2 million (not $5 million).  *See Barry II*, 437 F.

Supp. 3d at 58.

　　　　For family member claimants, the relationship between the victim and the family member

who seeks relief determines the baseline amount of the award.  *See Peterson*, 515 F. Supp. 2d at

51.  As a starting point, the family of a deceased victim typically receives damages in the amount

of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling.

*Schooley v. Islamic Republic of Iran,* No. 17-cv-1376, 2019 WL 2717888, at *77 (D.D.C. June

27, 2019).  These amounts are halved for the family of an injured victim, with courts generally

awarding $4 million to a spouse, $2.5 million to a child or parent, and $1.25 million to a sibling.

*Id.*  And the baseline amounts are further reduced in cases where the victim incurred only

emotional injuries as a result of the attack. *Id.* In such cases, this Court has applied a baseline award of $1.5 million for a spouse, $1 million for a parent or child, and $500,000 for a sibling. *Barry II*, 437 F. Supp. 3d at 58.

In all situations, an upward adjustment may be appropriate "in cases 'with aggravating circumstances,' indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Valore*, 700 F. Supp. 2d at 85–86 (first quoting *Greenbaum*, 451 F. Supp. 2d at 108, then quoting *Flatow*, 999 F. Supp. at 31). Whether such an adjustment is in order is a fact-specific inquiry that "cannot be defined through models and variables." *Fraenkel*, 892 F.3d at 357 (quoting *Flatow*, 999 F. Supp. at 29–30). For instance, for a claim made by the family member of a decedent victim, a court may take into account, *inter alia*, "[h]ow the claimant learned of [the] decedent's death, and whether there was an opportunity to say goodbye or view the body"; "[t]he nature of the relationship between the claimant and the decedent," particularly if it was "strong and close"; and the "decedent's position in the family birth order relative to the claimant." *Id.* (quoting *Flatow*, 999 F. Supp. at 31–32). In parsing the relevant facts, a district court is to bear in mind that "past solatium awards from comparable cases are appropriate sources of guidance," but "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." *Id.* at 362 (citation omitted); *see also Schooley*, 2019 WL 2717888, at *77 (citing *Fraenkel*, 892 F.3d at 362).

### b. The Special Master's Damages Analysis

The Special Master's report and recommendation makes clear that he engaged in the analysis contemplated by the *Heiser* framework as complemented by this Court's discussion in *Barry II*. *See Barry II*, 437 F. Supp. 3d at 58 (applying a reduced baseline award for victims and

family members when the victim only incurred emotional injury).  Specifically, Special Master

Griffin states that "the well-established *Heiser* framework as adopted in . . . *Barry* is the proper

basis for assessing the damages to be awarded to Plaintiffs."  R. & R. ¶ 3388.  He explains that

"[t]he *Heiser* framework provides baseline figures and a basic methodology by which to

ascertain the 'appropriate measure of damages' both for directly-injured victims and for 'the

family members of victims who died' or were injured in a terrorist attack."  *Id.* (quoting *Barry II*,

437 F. Supp. 3d at 53).  And he adds that, where a victim suffered emotional injury alone, the

proper baseline awards are adjusted downward such that $2 million serves as the typical award to

the victim, $1.5 million to the victim's spouse, $1 million to the victim's parent or child, and

$500,000 to any of the victim's siblings.  *Id.* ¶¶ 3396, 3398.

The Special Master then further explains that, in all events, courts may adjust specific

awards upward or downward to account for each plaintiff's unique circumstances.  *Id.* ¶ 3388.  In

*Barry II*, the Court noted that the Special Master's supplemental filing "clarified that each

upward departure is based on factors identified by courts in this district."  437 F. Supp. 3d at 54

(citation omitted).  Here, the Special Master's report and recommendation makes clear that the

Special Master again operated under this framework.  *See* R. & R. ¶¶ 3399, 3401 (detailing the

factors justifying upward departures and stating that "[t]he Special Master has applied [this]

framework to each family member victim").  Similarly, in *Barry II*, the Court noted that Special

Master Griffin had "augmented his original report with a description of the factual basis

underlying the proposed increase[s]" "for each of the forty recommended upward departures."

437 F. Supp. 3d at 54.  There is no such supplementation here, but the Special Master's report

and recommendation does address its upward departures.  *See, e.g.*, R. & R. ¶ 57 (concluding

that "[a]n upward departure in the compensatory damages award to [Barbara Ann Maxwell]" is

appropriate because of the facts making her emotional injuries "uniquely agonizing and long-lasting"); *id.* ¶ 92 (concluding that "[a]n upward departure in the compensatory damages award to Yun Hui Twine" is appropriate because of the facts making her emotional injuries "uniquely severe and long-lasting").[31]

Having reviewed these materials, the Court is persuaded by the Special Master's analysis.[32]  Because Special Master Griffin's report and recommendation confirms that each proposed upward departure reflects one or more of the factors that warrant such increases, the Court agrees that an upward departure in the proposed amount is appropriate for the specified

---

[31] The Special Master's findings of fact rely on signed, sworn affidavits that provide information about each of the victims.  R. & R. ¶ 6.  Although Special Master Griffin did not "review[] any medical records regarding each victim's injuries or otherwise independently verif[y] any specific medical diagnosis," he based his recommendations for upward departures on "the uncontroverted sworn testimony" and "publicly available information, including medical articles and literature, discussing the potential causal link between severe trauma such as each victim's experience in and as a result of the Beirut Embassy Attacks and the referenced medical conditions."  *Id.* ¶ 8.  His proposed damages "are based on a holistic review of the entirety of each victim's (and the victim's family members') testimony regarding" the impact of the attacks.  *Id.* ¶ 9.

[32] Whether the evidence provided is adequate to support a plaintiff's claim for relief is left to the Court's discretion.  *See Han Kim*, 774 F.3d at 1047–48 ("[The] FSIA leaves it to the court to determine precisely how much and what kinds of evidence . . . plaintiff[s] must provide, requiring only that it be 'satisfactory to the court.'" (quoting 28 U.S.C. § 1608(e))).  In this case, the Court is mindful that Congress intended, in providing a private right of action under section 1605A of the FSIA, to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."  *Id.* at 1048 (quoting *Price*, 294 F.3d at 88–89).  An overly stringent evidentiary standard would not support this objective, particularly where, as here, the events at issue occurred nearly forty years ago.  *See Fraenkel*, 892 F.3d at 353 ("[T]he quantum and quality of evidence that might satisfy a court [and allow a plaintiff to obtain default judgment in an action under the FSIA] can be less than that normally required." (citation omitted)).  This Circuit has directed district courts to exercise the "broad discretion" available to them "to determine what degree and kind of evidence is satisfactory," *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019) (citing *Han Kim*, 774 F.3d at 1047; *Owens II*, 864 F.3d at 785), "[s]o [that] the burden imposed on district courts is moderated," *id.*  Thus, the Court is satisfied by the forms of evidence upon which the Special Master has relied and adopts his findings of fact.  *Accord Roth*, 78 F. Supp. 3d at 386 (stating that a court resolving a suit brought under the FSIA "may rely on uncontroverted factual allegations that are supported by affidavits" (citing *Rimkus*, 750 F. Supp. 2d at 171)).

individuals.  Accordingly, the Court adopts all of the Special Master's proposed compensatory

damages recommendations except for his recommendations regarding the estates governed by

English law.

Before moving on, it is worth noting two particular recommendations that are

incorporated within the Court's general adoption of the Special Master's damages

recommendations.  First, the Special Master recommends awarding independent awards under

the *Heiser* framework to forty-two family member Plaintiffs who "had the unique misfortune of

[having family members] suffer[] injuries as a result of both the 1983" and 1984 attacks.[33]

R. & R. ¶ 3401 n.41.  The Court addressed a similar, but different, question in *Barry II*: how to

calculate awards for "immediate family member Smith Plaintiffs who suffered the misfortune of

having more than one family member injured in a *single attack*."  437 F. Supp. 3d at 55

(emphasis added).  The Court declined to adopt the separate-awards approach for these plaintiffs

in *Barry II* because it was "concerned that combining multiple solatium awards would cause

family members of attack victims to recover larger solatium awards than most direct terrorist

attack victims recover in pain and suffering damages."  *Id.* at 56 (quoting *Wultz*, 864 F. Supp. 2d

at 40).  But the Court emphasized that the concern related to family members recovering multiple

---

[33] The specific family member Plaintiffs fitting this description are John Son LBrown, Jane Mother LBrown, John Brother LBrown, Jane Sister1 LBrown, Jane Sister2 LBrown, Jane Sister3 LBrown, Jane Sister4 LBrown, Jane Wife PBrown, John Son4 PBrown, John Son1 PBrown, John Son2 PBrown, John Son3 PBrown, Jane Daughter1 PBrown, Jane Daughter2 PBrown, Jane Daughter3 PBrown, John Son RBrown, Jane Wife VBrown, John Son1 VBrown, John Son2 VBrown, Jane Wife GGBrown, John Son GGBrown, Jane Daughter1 GGBrown, Jane Daughter2 GGBrown, Jane Daughter3 GGBrown, John Husband PPBrown,  John Son PPBrown, John Daughter1 PPBrown, Jane Daughter2 PPBrown, Jane Daughter3 PPBrown, John Brother ZZBrown, Jane Sister ZZBrown, John Father IIIBrown, Jane Mother IIIBrown, John Brother1 IIIBrown, John Brother2 IIIBrown, John Brother3 IIIBrown, Jane Sister1 IIIBrown, Jane Sister2 IIIBrown, Jane Sister3 IIIBrown, Jane Sister4 IIIBrown, Jane Wife KKKBrown, Jane Daughter1 KKKBrown, and Jane Daughter2 KKKBrown.  R. & R. ¶ 3401 n.41.

solatium awards from a single attack.  *See id.* at 55 (describing award adjustment as concerning

plaintiffs "having more than one family member injured in a single attack"); *id.* at 55 n.50 ("This

category is distinct from individuals who raise claims pursuant to both the 1983 and 1984

attacks."); *id.* at 56 (citing authority regarding "[w]here multiple family members are all injured

in the same attack" (quoting *Schertzman Cohen*, 2019 WL 3037868, at *9).  The fairness concern

from *Barry II* does not seem applicable here.  Moreover, the Court adopted the approach that the

Special Master recommends in a prior case addressing the same issue.  *See* Sealed Mem. Op.,

*Jones*, No. 20-cv-00850, ECF No. 43 at 42 n.30.  Therefore, the Court adopts the Special

Master's recommendation that separate and independent awards be issued to the family member

Plaintiffs whose loved ones were injured in both the 1983 and 1984 attacks.

　　　Second, the Special Master recommends awarding the estate of John Victim Brown (an

individual who died in the 1983 attack) compensatory damages for the pain and suffering he

endured during the period between his injury and death.  R. & R. ¶¶ 175–177, 3393.  Unlike a

wrongful death action, a so-called "survival action accrues upon the death of an injured person

and 'limits recovery for damages for loss or impairment of earning capacity, emotional distress

and all other harms, to harms suffered before death.'"  *Estate of Hirshfeld*, 330 F. Supp. 3d at

139 (quoting Restatement (Second) of Torts § 926).  In order for a plaintiff who was killed in the

attack to recover such damages, he must show that his death was not "instantaneous" and that he

"consciously experienced the time between [the] attack and his . . . death."  *Roth*, 78 F. Supp. 3d

at 402; *see Barry II*, 437 F. Supp. 3d at 45 n.36 (explaining that plaintiff must show that he

experienced "pain and suffering before death").  Here, the complaint states a claim for a

"survival" action, Compl. at 164, and the Special Master's factual findings cite uncontroverted

evidence suggesting that John Victim Brown's death was not instantaneous, that he was

conscious for a period of time, and that he experienced pain and suffering before succumbing to his injuries. *See, e.g.*, R. & R. ¶ 176 (explaining that although the victim was "buried . . . under the rubble," his body bore no "obvious external injuries," making it "reasonable to conclude" that his death was "not instantaneous" but rather the result of "asphyxiation"); *id.* at ¶ 3393 (explaining that "[t]he lack of other injuries indicates that [John Victim Brown] was conscious during the period that he was trapped"). That being so, his estate is entitled to claim survival damages.

### 2.  Economic Damages

#### a.  Wrongful Death

The Court now considers the wrongful death claims brought on behalf of Plaintiffs who were fatally wounded in one of the attacks, and on behalf of whom the legal representative of each estate seeks to recover for economic loss.[34] *See* Compl. ¶¶ 452–456. The FSIA authorizes "[a] wrongful-death action" to be "brought through the estate of the decedent[] 'for economic losses which result from a decedent's premature death.'" *Valore*, 700 F. Supp. 2d at 78 (quoting *Flatow*, 999 F. Supp. at 27); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010). To provide support for such a claim for relief, "the report of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *see also Belkin*, 667

---

[34] The ten Plaintiffs who pursue this theory of relief are Ben Henry Maxwell, Compl. ¶ 8, Richard Twine, *id.* ¶ 15, John Victim Brown, *id.* ¶ 26, John Victim ABrown, *id.* ¶ 31, John Victim BBrown, *id.* ¶ 40, John Victim CBrown, *id.* ¶ 49, John Victim DBrown, *id.* ¶ 55, John Victim EBrown, *id.* ¶ 63, John Victim FBrown, *id.* ¶ 70, and John Victim GBrown, *id.* ¶ 76. Because, as discussed previously, Plaintiffs have already established Defendant's liability for the tort of wrongful death, and because these ten individuals were U.S. service members, government employees, or contractors at the time of the attack, Compl. ¶¶ 8, 15, 26, 31, 40, 49, 55, 63, 70, 76, and thus fall within section 1605A(c)'s enumerated categories, the Court looks exclusively to section 1605A(c) in its damages analysis.

F. Supp. 2d at 24 (relying on forensic economist's report in calculation of economic damages).

A court that relies upon such an expert report is to assess the "reasonableness and foundation of

the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed*, 845 F.

Supp. 2d at 214).

Here, the Special Master's report and recommendation states that he relied on such an

expert report to make economic damages recommendations.  Specifically, Special Master Griffin

assessed a report provided by Steven A. Wolf, a CPA who assessed "the present value dollar

amount of each individual's past and future income loss directly attributable to [his or her]

premature death . . . as compared to [his or her] planned or anticipated employment opportunities

if the plaintiff would have lived a typical life in Lebanon." R. & R. ¶ 3391 (citation omitted).

Mr. Wolf is the same expert who assessed economic damages in not only *Barry II*, 437 F. Supp.

3d at 59, *Dammarell I*, 281 F. Supp. 2d at 120, and *Estate of Doe II*, 943 F. Supp. 2d at 185, *see

also* R. & R. ¶ 3391, but also in other FSIA cases such as *Owens v. Republic of Sudan* ("*Owens

I*"), 71 F. Supp. 3d 252, 258 (D.D.C. 2014), and *Reed*, 845 F. Supp. 2d at 214.  The Special

Master explains that "Wolf's calculations rely on 'each victim's historical earnings history,

employment record, economic statistics, employment and wage certification documentation . . . ,

[and] testimonial evidence via affidavits presented by the individual victims' families, among

other sources." R. & R. ¶ 3391 (citation omitted).  His projections "'use conservative financial

assumptions' such as a fixed employment status and income level." *Id.* (citation omitted).

Moreover, the specific methodology "employed to calculate economic losses is the same" as the

one that Mr. Wolf used in *Barry II*, *Dammarell*, and *Estate of Doe*. *Id.*  Special Master Griffin

indicates that the expert report itself is "similar to reports previously approved by this Court and

others in this district in other FSIA cases, including cases involving claims by colleagues of

Plaintiffs based on the 1983 Attack." *Id.* (citation omitted).  Based on the uncontroverted record before it, the Court accepts Special Master Griffin's conclusions concerning the report, the methodology adopted therein, and his associated recommendations and, accordingly, adopts the proposed economic damages awards for the estates of Plaintiffs killed in the attacks.

### b.  One Survivor's Economic Damages

There is one additional aspect of the Special Master's report and recommendation regarding economic damages that warrants analysis.  Specifically, although most of the Plaintiffs who were injured in one or both of the attacks on the Embassy seek only to recover for their pain and suffering, one Plaintiff who was injured in the 1984 attack—John Victim YYBrown—also seeks to recover economic damages for "lost income" resulting from injuries he incurred during the bombing.  R. & R. ¶ 3391.  Courts in this district have held that victims injured in the attacks "may recover economic damages, which typically include lost wages (both past and future), benefits and retirement pay, and other out-of-pocket expenses."  *Bluth*, 203 F. Supp. 3d at 24; *see Valore*, 700 F. Supp. 2d at 85 (awarding damages to victims for "lost wages resulting from permanent and debilitating injuries suffered in the attack"); *Fain v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (same); *Murphy*, 740 F. Supp. 2d at 78 (same).  Here, John Victim YYBrown "suffered extensive and permanent injuries as a result of" the attack that left him unable to "pursue his degree or career as a research professor."  R. & R. ¶¶ 2623–33.  Based on the information provided to him, Mr. Wolf concluded that John Victim YYBrown had suffered economic damages of approximately $4,568,876.00 in lost income and medical expenses.  *See* Report of Steven A. Wolf, ECF No. 24-1 at 29.  The Special Master, too, was persuaded both by the evidence of Mr. YYBrown's injury and the size of his economic loss as assessed by Mr. Wolf.  Accordingly, the Special Master recommends that John Victim

YYBrown receive economic damages of $4,568,876.00, in addition to his award for pain and suffering.  R. & R. ¶¶ 2634.  The uncontroverted record supports the Special Master's recommendation on this aspect of the matter, and the Court therefore adopts it.

### 3.  Prejudgment Interest

In *Barry II*, the Court provided a thorough explanation of why it declined to award prejudgment interest to those plaintiffs.  *See* 437 F. Supp. 3d at 60–63.  This analysis included recognizing that "[c]ourts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits," *id.* at 60; recognizing that prejudgment interest would be duplicative for economic damages already "adjusted to reflect present-day dollar amounts," *id.* at 60–61 (citation omitted); and looking to the Restatement of Torts for relevant guidance on "the basic principles of tort law," *id.* at 61–62.  The Court continues to find its analysis in *Barry II* persuasive, and therefore adopts it in this case concerning similarly situated plaintiffs.

### 4.  Punitive Damages

One notable difference between this case and *Barry II* is that Plaintiffs here move for an award of punitive damages.  *See* Pls.' Mot. at 24–27.  The Smith plaintiffs in *Barry II* did not do so presumably because in *Barry I* this Court quickly dispensed with the Barry plaintiffs' motion for punitive damages based on the then-current "law of this Circuit" that "'the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A' in 2008."  *Barry I*, 410 F. Supp. 3d at 179 (quoting *Owens II*, 864 F.3d at 812).  The 1983 and 1984 bombings occurred well before 2008, so the Court concluded that the Barry plaintiffs could not be awarded punitive damages under the FSIA terrorism exception.  *Id.*  The Court also noted that this would be the

case under either state or federal causes of action.  *See id.* n.10 ("[A] plaintiff proceeding under either state or federal law cannot recover punitive damages for conduct occurring prior to the enactment of § 1605A." (quoting *Owens II*, 864 F.3d at 818)).  However, the Supreme Court has since vacated *Owens II*, holding that "Congress was as clear as it could have been when it authorized plaintiffs to seek and win punitive damages for past conduct using § 1605A(c)'s new federal cause of action."  *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1608 (2020); *see also id.* at 1610 (stating that the Court has "decided that punitive damages *are* permissible for federal claims"); *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 110 (D.D.C. 2021) ("Congress' 2008 amendments . . . authorized plaintiffs suing under § 1605A(c) to seek punitive damages for pre-2008 conduct." (citations omitted)); *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *20 (D.D.C. July 2, 2020) ("Congress clearly authorized plaintiffs suing under § 1605A(c) to seek punitive damages for pre-2008 conduct." (citation omitted)).  Plaintiffs' request for retroactive punitive damages for § 1605(c) claims must therefore be resolved on the merits.

Similarly, Plaintiffs' request for retroactive punitive damages for their state-law claims must also be resolved on the merits.  As this Court has previously explained, whether a Plaintiff can seek and receive retroactive punitive damages on state-law-based claims presents a somewhat murky question.  In *Owens II*, the D.C. Circuit refused to allow punitive damages for the state law claims for "the same reason" as the federal claims and because "it would be 'puzzling' if punitive damages were permissible for state claims but not federal ones."  *Opati*, 140 S. Ct. at 1610 (quoting *Owens II*, 864 F.3d at 817).  *Opati*, however, found that *Owens II*'s reasoning was "mistaken" as to the federal claims, and therefore ordered the D.C. Circuit to "reconsider its decision concerning the availability of punitive damages for claims proceeding under state law."  *Id.*  On remand, the D.C. Circuit ordered the parties to brief the availability of

punitive damages for state-law claims.  Order, *Owens II*, Doc. No. 1853544 (July 27, 2020).

After submitting their supplemental briefs, however, the parties subsequently reached a

settlement and obtained dismissal of the appeal, so the D.C. Circuit did not have occasion to rule

on the question.  Order, *Owens II*, Doc. No. 1941574 (Apr. 1, 2022).  Because the D.C. Circuit

"vacated all of the awards of punitive damages" "under both state and federal law," *Owens*, 864

F.3d at 812, 818, and *Opati* in turn "vacated" "[t]he judgment of the court of appeals with respect

to punitive damages," 140 S. Ct. at 1610, *Owens II*'s ruling on the availability of retroactive

punitive damages for state-law claims is no longer binding.

Plaintiffs have not brought to the Court's attention any subsequent decision by the D.C.

Circuit on this question, and the Court has not located any.  That said, a number of district courts

(including this one) have grappled with the issue post-*Opati* and, in doing so, have concluded

that retroactive punitive damages may be awarded on state-law claims.  *See* Sealed Mem. Op.,

*Jones*, No. 20-cv-00850, ECF No. 43 at 47–52 (explaining why statutory text, structure,

legislative history, and the reasoning in *Opati* all lead to the conclusion that Congress intended to

enable plaintiffs to seek punitive damages based on state-law claims); *see also* Order*, Sheikh v.

Republic of Sudan*, No. 14-cv-2090 (JDB), ECF No. 100 at 5–9 (D.D.C. Nov. 9, 2022) (holding

that "retroactive punitive damages are available to state law claimants for the same reasons they

are available to federal law claimants under § 1605A").  The Court continues to find its prior

analysis persuasive, and, as a result, will address Plaintiffs' request for retroactive punitive

damages under their state-law claims on the merits.

Having established that Plaintiffs are eligible for retroactive punitive damages for both

their federal and state-law claims, the Court proceeds to determine the amount of their awards.

"Courts calculate the proper amount of punitive damages by considering four factors: (1) the

character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 81 (D.D.C. 2014) (citation omitted); *Flatow*, 999 F. Supp. at 32 (identifying these four factors as governing punitive damages under "[g]eneral principles of tort law" (citing Restatement (Second) of Torts § 908)).  It is easy to conclude that these factors justify punitive damages here.  Little needs to be said about the horrendous character of the 1983 and 1984 bombings nor the nature and extent of the harm caused.  *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 59 (awarding $300 million in punitive damages against Iran for 1984 Embassy Annex bombing with little analysis).  It is also clear that there is a high need for deterrence of terrorist attacks and that a sovereign nation such as Iran possesses significant wealth.  *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 251 (D.D.C. 2020) (awarding punitive damages for 1983 Embassy bombing after concluding that all four factors support awarding punitive damages).  However, "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little additional deterrent effect."  *Murphy*, 740 F. Supp. 2d at 81; *see also Ewan*, 466 F. Supp. 3d at 251 ("This question becomes doubly complicated when trying to assess the proper award of punitive damages in a case subsequent to others that already imposed punitive damages for the same incident.").  The concern about over-punishing and questionable deterrent effect is present here seeing as punitive damages have been awarded in many previous cases arising from the Beirut Embassy attacks.  *See, e.g.*, Sealed Mem. Op., *Jones*, No. 20-cv-00850, ECF No. 43 at 54; *Wagner*, 172 F. Supp. 2d at 138; *Brewer*, 664 F. Supp. 2d at 58–59; *Estate of Doe II*, 943 F. Supp. 2d at 189–91; *Ewan*, 466 F. Supp. 3d at 251–52.

The courts that have awarded punitive damages arising from the Beirut Embassy attacks have varied in their approaches to calculating the proper amount of such damages.  No one approach, however, is significantly more persuasive or dominant in the case law than others.  For example, in a number of prior cases, courts were persuaded to award $300 million in punitive damages—a sum representing "three times the amount of the most current estimates of Iran's annual expenditures" on terrorism.  *Wagner*, 172 F. Supp. 2d at 137–38 (collecting cases); *see Brewer*, 664 F. Supp. 2d at 58–59.  More recently, however, courts have calculated punitive damages based on "the ratio of the prior award of punitive damages [in cases arising out of the 1983 bombing] relative to the prior award of compensatory damages [in cases arising out of the same incident]."  *Ewan*, 466 F. Supp. 3d at 252; *see Murphy*, 740 F. Supp. 2d at 82.  That methodology yields a ratio of $0.03699 of punitive damages for every $1 of compensatory damages.  *Ewan*, 466 F. Supp. 3d at 252.  The Plaintiffs argue that application of "the same ratio is appropriate here."  Pls.' Mot. at 27.  In light of the recency of *Ewan* and the fact that it addressed one of the same attacks at issue here, the Court will use *Ewan*'s ratio of $0.03699 of punitive damages for every $1 of compensatory damages.  The sum of compensatory damages reported in the Appendix is $1,189,694,232.00.  Therefore, Plaintiffs will be awarded punitive damages in the amount of $44,006,789.64.  "The Court will apportion punitive damages among plaintiffs according to their compensatory damages."  *Opati*, 60 F. Supp. 3d at 82; *see also* Order, *Opati*, No. 12-cv-1224 (D.D.C. July 24, 2015), ECF No. 44 (apportioning punitive damages without distinction among state and federal claims); *W.A. v. Islamic Republic of Iran*, 2020 WL 7869218, at *20 (D.D.C. Mar. 23, 2020) (same).

*          *          *

Summing up, then, the Court awards over $1.1 billion in compensatory damages (including economic, pain & suffering, and solatium) to Plaintiffs, adopting almost all of the proposals indicated by the Special Master as discussed above and as reflected in the attached Appendix, and will further award over $44 million in punitive damages to be divided among Plaintiffs in proportion to their compensatory damages using the *Ewan* ratio.  All in all, the Court's award totals over $1.2 billion.  Although no dollar figure can redress what Plaintiffs have suffered, the Court hopes that this award brings some small measure of resolution to these families.

### V.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment on liability and an award of punitive damages (ECF No. 29) is **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' motion to substitute (ECF No. 20) is **GRANTED**; Plaintiffs' motion to adopt the Special Master's Report and Recommendation (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**; and the Special Master's report and recommendation is **ADOPTED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 22, 2024                                    RUDOLPH CONTRERAS
                                                             United States District Judge

## APPENDIX:  DAMAGES AWARDS

| Pseudonym Name | Compensatory Damages - 1983 Attack | | | Compensatory Damages - 1984 Attack | | | Total Compensatory Award | Punitive Award | Total Award |
|---|---|---|---|---|---|---|---|---|---|
| | Economic | Pain & Suffering | Solatium | Economic | Pain & Suffering | Solatium | | | |
| Estate of Ben Henry Maxwell | $4,897,203.00 | $0 | $0 | $0 | $0 | $0 | $ 4,897,203.00 | $ 181,147.54 | $ 5,078,350.54 |
| Eunice Maxine Woody | $0 | $0 | $10,000,000.00 | $0 | $0 | $0 | $10,000,000.00 | $ 369,900.00 | $ 10,369,900.00 |
| Estate of Virginia Glover Maxwell | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| Lelia Maxwell Johnson | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Barbara Ann Maxwell | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| Martha M. Jones | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Jannie Lee Bringman | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Estate of Richard Twine | $3,169,896.00 | $0 | $0 | $0 | $0 | $0 | $3,169,896.00 | $ 117,254.45 | $ 3,287,150.45 |
| Yun Hui Twine | $0 | $0 | $9,000,000.00 | $0 | $0 | $0 | $9,000,000.00 | $ 332,910.00 | $ 9,332,910.00 |
| James Charles Twine | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| Richard W. Twine | $0 | $0 | $5,500,000.00 | $0 | $0 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| Andrea Lynn Meyers (a/k/a Andrea Twine; Andrea Masterson) | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| Estate of Charles James Twine | $0 | $0 | $0 | $0 | $0 | $0 | $ 0 | $ 0 | $ 0 |
| Estate of Violet Elsie Twine | $0 | $0 | $0 | $0 | $0 | $0 | $ 0 | $ 0 | $ 0 |
| David Charles Twine | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **John William Gilden, Jr.** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **James Robert Gilden** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jill Denise Robbins** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Victim Brown** | $577,459.00 | $5,000,000.00 | $0 | $0 | $0 | $0 | $5,577,459.00 | $ 206,310.21 | $ 5,783,769.21 |
| **Estate of Jane Wife Brown** | $0 | $0 | $8,000,000.00 | $0 | $0 | $0 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **John Son1 Brown** | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son2 Brown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son3 Brown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Estate of John Victim ABrown** | $144,259.00 | $0 | $0 | $0 | $0 | $0 | $144,259.00 | $ 5,336.14 | $ 149,595.14 |
| **Jane Wife ABrown** | $0 | $0 | $9,000,000.00 | $0 | $0 | $0 | $9,000,000.00 | $ 332,910.00 | $ 9,332,910.00 |
| **John Son ABrown** | $0 | $0 | $7,000,000.00 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Jane Daughter ABrown** | $0 | $0 | $7,000,000.00 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **John Brother1 ABrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **John Brother2 ABrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother3 ABrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister1 ABrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Sister2 ABrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Victim BBrown** | $0 | $0 | $0 | $747,996.00 | $0 | $0 | $747,996.00 | $ 27,668.37 | $ 775,664.37 |
| **Estate of Jane Mother BBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Brother1 BBrown** | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of John Brother2 BBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister1 BBrown** | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister2 BBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister3 BBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister4 BBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister5 BBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Victim CBrown** | $2,655,633.00 | $0 | $0 | $0 | $0 | $0 | $2,655,633.00 | $ 98,231.86 | $ 2,753,864.86 |
| **Estate of Jane Mother CBrown** | $0 | $0 | $7,000,000.00 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Estate of Jane Sister1 CBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of Jane Sister2 CBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister3 CBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister4 CBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of John Victim DBrown** | $0 | $0 | $0 | $688,693.00 | $0 | $0 | $688,693.00 | $ 25,474.75 | $  714,167.75 |
| **Jane Mother DBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Brother1 DBrown** | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **John Brother2 DBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother3 DBrown** | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister1 DBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister2 DBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister3 DBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Victim EBrown** | $0 | $0 | $0 | $1,059,638.00 | $0 | $0 | $1,059,638.00 | $ 39,196.01 | $ 1,098,834.01 |
| **Jane Wife EBrown** | $0 | $0 | $0 | $0 | $0 | $8,000,000.00 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **John Son1 EBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **John Son2 EBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son3 EBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Mother EBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Brother EBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Victim FBrown** | $67,563.00 | $0 | $0 | $0 | $0 | $0 | $67,563.00 | $ 2,499.16 | $ 70,062.16 |
| **Jane Wife FBrown** | $0 | $0 | $9,000,000.00 | $0 | $0 | $0 | $9,000,000.00 | $ 332,910.00 | $ 9,332,910.00 |
| **John Son1 FBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son2 FBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son3 FBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son4 FBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Estate of John Victim GBrown** | $117,016.00 | $0 | $0 | $0 | $0 | $0 | $117,016.00 | $ 4,328.42 | $  121,344.42 |
| **Estate of John Father GBrown** | $0 | $0 | $7,000,000.00 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Estate of Jane Mother GBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Estate of John Brother1 GBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **John Brother2 GBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **John Brother3 GBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister1 GBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Sister2 GBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of Jane Mother HBrown** | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Mother IBrown** | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Father JBrown** | $0 | $0 | $5,500,000.00 | $0 | $0 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Estate of Jane Mother KBrown | $0 | $0 | $5,000,000.00 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| Estate of John Brother KBrown | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Jane Sister1 KBrown | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Jane Sister2 KBrown | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| Estate of Evelyn Betty Middleton | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Bette Anne Wheeler | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Karen Marie Rodriguez | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Russell Franklin Brant | $0 | $0 | $0 | $0 | $6,000,000.00 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| Estate of Tommie Franklin Brant | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Estate of Ann Wooten Brant | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Thomas Jeffrey Brant | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Laura Brant Lenski | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Letitia Kelly Butler | $0 | $7,000,000.00 | $0 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| Malcolm Heaton Butler | $0 | $6,000,000.00 | $0 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| Michael Grover Coe | $0 | $7,000,000.00 | $0 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| Mark Milton Foulon | $0 | $0 | $0 | $0 | $6,500,000.00 | $0 | $6,500,000.00 | $ 240,435.00 | $ 6,740,435.00 |
| Murray John McCann | $0 | $3,000,000.00 | $0 | $0 | $0 | $0 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| Collette McCann Schoellkopf | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| Lawrence Herbert Liptak | $0 | $6,500,000.00 | $0 | $0 | $0 | $0 | $6,500,000.00 | $ 240,435.00 | $ 6,740,435.00 |
| Christopher Wade Stelyan Ross | $0 | $2,000,000.00 | $0 | $0 | $0 | $0 | $2,000,000.00 | $ 73,980.00 | $ 2,073,980.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Estate of Albert Nicholas Alexander** | $0 | $5,000,000.00 | $0 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Susan Helene Alexander** | $0 | $0 | $4,000,000.00 | $0 | $0 | $0 | $4,000,000.00 | $ 147,960.00 | $ 4,147,960.00 |
| **Jonathan Matthew Alexander** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **David Benjamin Alexander** | $0 | $0 | $3,000,000.00 | $0 | $0 | $0 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **Philip Albert Alexander** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Conwill Randolph Casey** | $0 | $5,750,000.00 | $0 | $0 | $0 | $0 | $5,750,000.00 | $ 212,692.50 | $ 5,962,692.50 |
| **Peter James Hussey** | $0 | $0 | $0 | $0 | $5,500,000.00 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **Estate of John Joseph Hussey, Jr.** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jeannette Marie Hussey** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Daniel Joseph Hussey** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Lisa Ann Piascik** | $0 | $3,000,000.00 | $0 | $0 | $0 | $0 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **Estate of Raymond Joseph Piascik** | $0 | $0 | $1,000,000.00 | $0 | $0 | $0 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Shirley Ethel Marston** | $0 | $0 | $1,000,000.00 | $0 | $0 | $0 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **John Son LBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $3,500,000.00 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Estate of Jane Mother LBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Brother LBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $1,250,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister1 LBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $1,250,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister2 LBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $1,250,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Sister3 LBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $1,250,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister4 LBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $1,250,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Victim MBrown** | $0 | $7,000,000.00 | $0 | $0 | $0 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Estate of Jane Wife MBrown** | $0 | $0 | $6,000,000.00 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son1 MBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **John Son2 MBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **Jane Daughter1 MBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **Jane Daughter2 MBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **Estate of Jane Sister NBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Father OBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of Jane Mother OBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of John Victim PBrown** | $0 | $5,000,000.00 | $0 | $0 | $5,000,000.00 | $0 | $10,000,000.00 | $ 369,900.00 | $ 10,369,900.00 |
| **Estate of Jane Wife PBrown** | $0 | $0 | $4,000,000.00 | $0 | $0 | $4,000,000.00 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **John Son4 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son1 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son2 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son3 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter1 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Daughter2 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter3 PBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Mother QBrown** | $0 | $0 | $1,000,000.00 | $0 | $0 | $0 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **John Brother QBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $  518,495.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **John Son RBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Victim SBrown Brother1 TBrown** | $0 | $0 | $0 | $0 | $5,500,000.00 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **Estate of John Father SBrown Father TBrown** | $0 | $0 | $0 | $0 | $0 | $3,000,000.00 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **Estate of Jane Mother SBrown Mother TBrown** | $0 | $0 | $0 | $0 | $0 | $3,000,000.00 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **John Brother SBrown Brother2 TBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister SBrown Sister TBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Wife TBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter UBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother UBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Brother UBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Victim VBrown** | $0 | $6,000,000.00 | $0 | $0 | $7,000,000.00 | $0 | $13,000,000.00 | $ 480,870.00 | $ 13,480,870.00 |
| **Estate of Jane Wife VBrown** | $0 | $0 | $4,000,000.00 | $0 | $0 | $4,000,000.00 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **John Son1 VBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $2,500,000.00 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Son2 VBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Brother WBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother1 XBrown** | $0 | $0 | $1,750,000.00 | $0 | $0 | $0 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Estate of John Brother2 XBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister1 XBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 XBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Son YBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Father YBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother YBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister4 YBrown** | $0 | $0 | $2,250,000.00 | $0 | $0 | $0 | $2,250,000.00 | $ 83,227.50 | $ 2,333,227.50 |
| **Jane Sister5 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of Jane Sister6 YBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Victim ZBrown** | $0 | $0 | $0 | $0 | $5,500,000.00 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **Estate of John Father ZBrown** | $0 | $0 | $0 | $0 | $0 | $3,000,000.00 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **Estate of Jane Mother ZBrown** | $0 | $0 | $0 | $0 | $0 | $3,000,000.00 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **John Brother ZBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister1 ZBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister2 ZBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **John Brother1 AABrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **John Brother2 AABrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 AABrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 AABrown** | $0 | $0 | $0 | $0 | $0 | $2,000,000.00 | $2,000,000.00 | $ 73,980.00 | $ 2,073,980.00 |
| **Estate of Jane Mother BBBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 BBBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 BBBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 BBBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of Jane Sister2 BBBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Father CCBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother CCBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Victim DDBrown** | $0 | $6,000,000.00 | $0 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Estate of Jane Wife DDBrown** | $0 | $0 | $4,500,000.00 | $0 | $0 | $0 | $4,500,000.00 | $ 166,455.00 | $ 4,666,455.00 |
| **John Son1 DDBrown** | $0 | $0 | $3,000,000.00 | $0 | $0 | $0 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **John Son2 DDBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Daughter DDBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother DDBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 DDBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 DDBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 DDBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister2 DDBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Son EEBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister1 EEBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 EEBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Victim FFBrown** | $0 | $0 | $0 | $0 | $6,000,000.00 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Jane Wife FFBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son FFBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter1 FFBrown** | $0 | $0 | $0 | $0 | $0 | $4,000,000.00 | $4,000,000.00 | $ 147,960.00 | $ 4,147,960.00 |
| **Jane Daughter2 FFBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Victim GGBrown** | $0 | $6,000,000.00 | $0 | $0 | $2,000,000.00 | $0 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **Estate of Jane Wife GGBrown** | $0 | $0 | $4,000,000.00 | $0 | $0 | $1,500,000.00 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **John Son GGBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $1,000,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Daughter1 GGBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $1,000,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Daughter2 GGBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $1,000,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Jane Daughter3 GGBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $1,000,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **John Brother1 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Brother2 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Brother3 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Brother4 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Estate of Jane Sister1 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of Jane Sister2 HHBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother IIBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister IIBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of Jane Mother JJBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 JJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 JJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 JJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 JJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Victim KKBrown** | $0 | $6,000,000.00 | $0 | $0 | $0 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **Estate of John Father KKBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of Jane Mother KKBrown** | $0 | $0 | $3,500,000.00 | $0 | $0 | $0 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **John Brother KKBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister KKBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother LLBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister LLBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $0 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Victim MMBrown** | $0 | $0 | $0 | $0 | $5,000,000.00 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Father MMBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Mother MMBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **John Brother1 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,500,000.00 | $1,500,000.00 | $ 55,485.00 | $ 1,555,485.00 |
| **Jane Sister4 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister5 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister6 MMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Victim NNBrown** | $0 | $0 | $0 | $0 | $7,000,000.00 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Jane Wife NNBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **John Son NNBrown** | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **Estate of Jane Mother NNBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Victim OOBrown** | $0 | $0 | $0 | $0 | $6,000,000.00 | $0 | $6,000,000.00 | $ 221,940.00 | $ 6,221,940.00 |
| **John Father OOBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Mother OOBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother OOBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 OOBrown** | $0 | $0 | $0 | $0 | $0 | $2,000,000.00 | $2,000,000.00 | $ 73,980.00 | $ 2,073,980.00 |
| **Jane Sister2 OOBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

69

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Estate of John Husband PPBrown** | $0 | $0 | $4,000,000.00 | $0 | $0 | $4,000,000.00 | $8,000,000.00 | $ 295,920.00 | $ 8,295,920.00 |
| **John Son PPBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Daughter1 PPBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter2 PPBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter3 PPBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Father QQBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Brother1 QQBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 QQBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 QQBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister QQBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 RRBrown** | $0 | $0 | $0 | $0 | $0 | $500,000.00 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| **Jane Sister2 RRBrown** | $0 | $0 | $0 | $0 | $0 | $1,000,000.00 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Jane Victim SSBrown** | $0 | $2,000,000.00 | $0 | $0 | $0 | $0 | $2,000,000.00 | $ 73,980.00 | $ 2,073,980.00 |
| **John Husband SSBrown** | $0 | $0 | $1,500,000.00 | $0 | $0 | $0 | $1,500,000.00 | $ 55,485.00 | $ 1,555,485.00 |
| **John Son SSBrown** | $0 | $0 | $1,000,000.00 | $0 | $0 | $0 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Estate of Jane Mother SSBrown** | $0 | $0 | $1,000,000.00 | $0 | $0 | $0 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Estate of John Brother1 SSBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| **John Brother2 SSBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| **Jane Sister1 SSBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $  518,495.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister2 SSBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $0 | $500,000.00 | $ 18,495.00 | $ 518,495.00 |
| **John Victim TTBrown** | $0 | $0 | $0 | $0 | $6,500,000.00 | $0 | $6,500,000.00 | $ 240,435.00 | $ 6,740,435.00 |
| **Jane Wife TTBrown** | $0 | $0 | $0 | $0 | $0 | $5,000,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter1 TTBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Daughter2 TTBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Father TTBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother TTBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister4 TTBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Father UUBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Mother UUBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 UUBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 UUBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 UUBrown** | $0 | $0 | $0 | $0 | $0 | $3,000,000.00 | $3,000,000.00 | $ 110,970.00 | $ 3,110,970.00 |
| **John Brother4 UUBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother5 UUBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Estate of Jane Sister UU Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Estate of John Victim VV Brown | $0 | $5,000,000.00 | $0 | $0 | $0 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| Jane Wife VV Brown | $0 | $0 | $4,000,000.00 | $0 | $0 | $0 | $4,000,000.00 | $ 147,960.00 | $ 4,147,960.00 |
| John Son1 VV Brown | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| John Son2 VV Brown | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Jane Daughter VV Brown | $0 | $0 | $2,500,000.00 | $0 | $0 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Jane Sister WW Brown | $0 | $0 | $2,000,000.00 | $0 | $0 | $0 | $2,000,000.00 | $ 73,980.00 | $ 2,073,980.00 |
| John Victim XX Brown | $0 | $0 | $0 | $0 | $5,000,000.00 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| Estate of John Father XX Brown | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| Estate of Jane Mother XX Brown | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| John Brother1 XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| John Brother2 XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| John Brother3 XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| John Brother4 XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| John Brother5 XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| Jane Sister XX Brown | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| John Victim YY Brown | $0 | $0 | $0 | $4,568,876.00 | $10,000,000.00 | $0 | $14,568,876.00 | $ 538,902.72 | $ 15,107,778.72 |
| Estate of John Father YY Brown | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| Estate of Jane Mother YY Brown | $0 | $0 | $0 | $0 | $0 | $3,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Jane Sister1 YYBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister2 YYBrown** | $0 | $0 | $0 | $0 | $0 | $2,250,000.00 | $2,250,000.00 | $ 83,227.50 | $ 2,333,227.50 |
| **Jane Sister3 YYBrown** | $0 | $0 | $0 | $0 | $0 | $1,500,000.00 | $1,500,000.00 | $ 55,485.00 | $ 1,555,485.00 |
| **Jane Sister4 YYBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother ZZBrown** | $0 | $0 | $1,750,000.00 | $0 | $0 | $500,000.00 | $2,250,000.00 | $ 83,227.50 | $ 2,333,227.50 |
| **Jane Sister ZZBrown** | $0 | $0 | $1,250,000.00 | $0 | $0 | $500,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Victim AAABrown** | $0 | $0 | $0 | $0 | $5,500,000.00 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **Estate of John Father BBBBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Brother CCCBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Victim DDDBrown** | $0 | $0 | $0 | $0 | $5,000,000.00 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of Jane Mother DDDBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Jane Sister1 DDDBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 DDDBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 DDDBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Victim EEEBrown** | $0 | $0 | $0 | $0 | $2,500,000.00 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Father EEEBrown** | $0 | $0 | $0 | $0 | $0 | $1,000,000.00 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Estate of Jane Mother EEEBrown** | $0 | $0 | $0 | $0 | $0 | $1,000,000.00 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Jane Sister EEEBrown** | $0 | $0 | $0 | $0 | $0 | $500,000.00 | $500,000.00 | $ 18,495.00 | $  518,495.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Estate of Jane Mother FFFBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Victim GGGBrown** | $0 | $0 | $0 | $0 | $2,500,000.00 | $0 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Father GGGBrown** | $0 | $0 | $0 | $0 | $0 | $1,000,000.00 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **Estate of Jane Mother GGGBrown** | $0 | $0 | $0 | $0 | $0 | $1,000,000.00 | $1,000,000.00 | $ 36,990.00 | $ 1,036,990.00 |
| **John Brother1 GGGBrown** | $0 | $0 | $0 | $0 | $0 | $500,000.00 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| **John Brother2 GGGBrown** | $0 | $0 | $0 | $0 | $0 | $500,000.00 | $500,000.00 | $ 18,495.00 | $  518,495.00 |
| **John Victim HHHBrown** | $0 | $0 | $0 | $0 | $6,500,000.00 | $0 | $6,500,000.00 | $ 240,435.00 | $ 6,740,435.00 |
| **Estate of John Father HHHBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother HHHBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **John Brother3 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister1 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,500,000.00 | $1,500,000.00 | $ 55,485.00 | $ 1,555,485.00 |
| **Jane Sister2 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,750,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister4 HHHBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Victim IIIBrown** | $0 | $2,500,000.00 | $0 | $0 | $5,000,000.00 | $0 | $7,500,000.00 | $ 277,425.00 | $ 7,777,425.00 |
| **Estate of John Father IIIBrown** | $0 | $0 | $1,000,000.00 | $0 | $0 | $2,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Estate of Jane Mother IIIBrown** | $0 | $0 | $1,000,000.00 | $0 | $0 | $2,500,000.00 | $3,500,000.00 | $ 129,465.00 | $ 3,629,465.00 |
| **John Brother1 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **John Brother2 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **John Brother3 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister1 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister2 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister3 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Jane Sister4 IIIBrown** | $0 | $0 | $500,000.00 | $0 | $0 | $1,250,000.00 | $1,750,000.00 | $ 64,732.50 | $ 1,814,732.50 |
| **Estate of John Victim JJJBrown** | $0 | $0 | $0 | $0 | $5,000,000.00 | $0 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Estate of John Father JJJBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother JJJBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 JJJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 JJJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 JJJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 JJJBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Estate of John Victim KKKBrown** | $0 | $5,500,000.00 | $0 | $0 | $6,000,000.00 | $0 | $11,500,000.00 | $ 425,385.00 | $ 11,925,385.00 |
| **Jane Wife KKKBrown** | $0 | $0 | $4,000,000.00 | $0 | $0 | $5,000,000.00 | $9,000,000.00 | $ 332,910.00 | $ 9,332,910.00 |
| **Jane Daughter1 KKKBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $2,500,000.00 | $5,000,000.00 | $ 184,950.00 | $ 5,184,950.00 |
| **Jane Daughter2 KKKBrown** | $0 | $0 | $2,500,000.00 | $0 | $0 | $3,000,000.00 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Estate of John Father LLLBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother LLLBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of John Brother1 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister4 LLLBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Victim MMMBrown** | $0 | $0 | $0 | $0 | $5,500,000.00 | $0 | $5,500,000.00 | $ 203,445.00 | $ 5,703,445.00 |
| **Estate of John Father MMMBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother MMMBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister1 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister2 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **Jane Sister3 MMMBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **John Victim NNNBrown** | $0 | $0 | $0 | $0 | $7,000,000.00 | $0 | $7,000,000.00 | $ 258,930.00 | $ 7,258,930.00 |
| **Estate of John Father NNNBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **Estate of Jane Mother NNNBrown** | $0 | $0 | $0 | $0 | $0 | $2,500,000.00 | $2,500,000.00 | $ 92,475.00 | $ 2,592,475.00 |
| **John Brother1 NNNBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother2 NNNBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother3 NNNBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother4 NNNBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |
| **John Brother5 NNNBrown** | $0 | $0 | $0 | $0 | $0 | $1,250,000.00 | $1,250,000.00 | $ 46,237.50 | $ 1,296,237.50 |